**ABILITIES AND GOODWILL, INC., etc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, etc., Respondent.**

**No. 79–1151.**

United States Court of Appeals, First Circuit.

Argued Sept. 11, 1979.
Decided Dec. 18, 1979.

lated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by discharging 21 employees who announced that they would not return to work until Goodwill rehired its fired Director of Rehabilitation. Goodwill has petitioned this court pursuant to § 10(f) of the Act, 29 U.S.C. § 160(f).

The events which led to this case began with a dispute between Goodwill's Executive Director, Arthur Bennett, and its Director of Rehabilitation, Patrick Eisenhart. In a meeting in late June attended by Goodwill board president Harold Berk, Eisenhart accused Bennett of mismanagement, lack of ability, and dishonest practices. Eisenhart then stated that if Bennett fired him, he would take all of the staff employees with him. The meeting ended with Berk's instructions to Eisenhart that he gather supporting evidence for his allegations and put them down on paper.

Eisenhart proceeded to call a meeting of the employees at his home on June 28 at which he reported both on his meeting with Bennett and Berk and his accusation of Bennett as incompetent and asked the staff to compile any grievances relating to their particular programs. Eisenhart informed the employees that he might be fired for his attack on Bennett. After some discussion, the employees informed him that he could count on their support.

On July 8, 1974, Eisenhart was fired by Bennett. That evening, Eisenhart again met with the employees at his home. After several hours of discussing the firing and other issues related to Goodwill and their work there,[1] the employees decided that they would call in sick the next day. They also agreed to use their time during the "sick-out" to prepare a "Task Force Report" for the board of directors of Goodwill, detailing their complaints with the conditions, facilities and programs at work.[2]  A

Graydon G. Stevens, Portland, Me., with whom Barry Zimmerman, Peter H. Jacobs, and Bennett, Kelly & Zimmerman, P.A., Portland, Me., were on brief for petitioner.

Howard E. Perlstein, Atty., Washington, D.C., with whom John S. Irving, General Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, DOOLING, Senior District Judge.*

COFFIN, Chief Judge.

The National Relations Board found that Abilities and Goodwill, Inc. (Goodwill) vio-

* Of the Eastern District of New York, sitting by designation.

1. The record does not reveal the exact nature of these other issues discussed at this meeting.

2. The administrative law judge found that the Task Force Report did in its later pages contain some employee grievances concerning wages and working conditions, but that "in major part" it was directed at Bennett's honesty and competency. Berk apparently received the re-

copy of the report was delivered to each director, but not until after 9:00 p. m. on July 10.

After a two day "sick-out", the employees attempted to return to work but were prevented from doing so by their supervisors. They went to the Goodwill offices where a meeting of the board of directors was in progress. The employees communicated two ultimatums to the board: (1) that Eisenhart be rehired, and (2) that the entire group of employees be allowed to meet with the board. The board decided that such a meeting, with so many people, would be too unruly. President Berk and two other management representatives then met with the group of employees. At this meeting, in response to several direct questions, the employees made it clear that their first ultimatum still stood—they would not return to work until Eisenhart was rehired. They were then informed that by making this ultimatum they were terminating their employment with Goodwill.

One week later, the employees joined in a letter advising petitioner that they "were willing to return to work unconditionally because of [their] concern for [their] clients." They were told, however, that they had been fired and would have to reapply for their jobs. They sought redress from the Board. A hearing was held before an NLRB administrative law judge on an unfair labor practice complaint brought by the employees. On March 15, 1979, the Board affirmed a decision of the administrative law judge against Goodwill by a 3–2 margin and ordered Goodwill to rehire the employees with four and one-half years back pay. The petition to this court followed.

In seeking enforcement of its order, the Board contends that the firing of Eisenhart affected the working conditions of the employees, and therefore their undertaking of a strike to secure his rehiring was protected activity for which they could not be dis-

charged. Goodwill, on the other hand, argues that the employees' attempt to interfere with a management decision to discharge the second highest ranking management official falls outside of the Act's protection. Alternatively, Goodwill claims that even if the employees had a protected right to protest such a management decision, the particular means of protest which they chose must be reasonable and, under the circumstances of this case should not have taken the form of a strike.[3]

The decision whether or not an employee protest over a change in management personnel is protected under the Act is a difficult one which requires the balancing of competing interests. Traditionally, the interest of the employer in selecting its own management team has been recognized and insulated from protected employee activity. No court has ever held that the Act protects employee protests over changes in top level management personnel, nor has the Board previously advocated such a rule.

The employees, however, do have an interest in the composition of management personnel, and in exceptional circumstances this interest may outweigh that of management. Thus, when the particular management official involved is a low level foreman or supervisor who deals directly with the employees, and the employees' concern with the identity of that person is directly related to the terms and condition of their employment, both the Board and the courts have found that employee protests over changes in supervisory personnel may be protected. *See NLRB v. Okla-Inn*, 488 F.2d 498, 503 (10th Cir. 1973); *NLRB v. Guernsey-Muskingum Elec. Coop., Inc.*, 285 F.2d 8 (6th Cir. 1960); *NLRB v. Phoenix Mutual Life Insurance Co.*, 167 F.2d 983 (7th Cir.), *cert. denied*, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948).

■ We agree with the result in these cases. With a low level supervisor, the

---

port before the discharge of the employees, but had not looked at it.

**3.** Goodwill originally claimed that the Board *did not* have jurisdiction over it. In light of our

decision in *NLRB v. Kent County Ass'n for Retarded Citizens*, 590 F.2d 19 (1st Cir. 1978), Goodwill has not pressed this claim on this appeal.

employer's interest in having unfettered control over his selection is reduced while the nexus between his identity and the employees' work conditions is greater. Thus, in such a case, to the extent that an employee protest over a change in supervisory personnel is in fact a protest over the actual conditions of their employment, their protest would in principle be protected activity under the Act.

In this particular case, however, we are presented with an employee protest over the discharge of the second highest ranking management official. That circumstance is, however, somewhat diminished in significance; despite Eisenhart's rank, he was apparently not insulated from direct employee contact. Thus, from the employees' perspective, Eisenhart's position and nexus to their working conditions was arguably similar to that of a low level supervisor. Yet from the perspective of Goodwill's management, his position was that of a high level official.

In attempting to balance the competing interests thus presented, and to determine whether the employee protest in this particular case was protected, we are urged by Goodwill to consider the means of protest employed. The Board, however, which made no mention of this factor in its ruling, claims that we may not consider it in making our decision. Instead, the board contends that we are limited to applying an all-or-nothing test: if the employees have a right to engage in concerted activities—if that is, the personnel change affects or threatens their job interest—the concerted activities can take almost any form.[4]

The majority of courts which have been confronted with similar Board contentions have rejected the all-or-nothing test. *See Henning & Cheadle, Inc. v. NLRB*, 522 F.2d 1050, 1055 (7th Cir. 1975); *NLRB v. Okla-Inn, supra; Dobbs Houses, Inc. v. NLRB,*

325 F.2d 531, 538–39 (5th Cir. 1963); *NLRB v. Coal Creek Coal Co.*, 204 F.2d 579 (10th Cir. 1953). *But see Hagopian & Sons, Inc. v. NLRB*, 395 F.2d 947, 951–53 (6th Cir. 1968). Instead, the general rule adopted by the courts has been to look at a variety of factors, including the reasonableness of the means of protest, in order to determine if the employees' activities were protected.

In so proceeding, courts have generally held over Board protest than employee strikes over changes in even low level supervisory personnel are not protected. *See Henning & Cheadle, Inc. v. NLRB, supra; American Art Clay Co. v. NLRB, supra; Dobbs Houses, Inc. v. NLRB, supra.* On the other hand, courts have found protected the writing of letters expressing opposition, *NLRB v. Phoenix Mutual Life Insurance Co.*, 167 F.2d 983 (7th Cir.) *cert. denied*, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948), or the simple voicing of complaints, *NLRB v. Guernsey-Muskingum Elec. Coop., Inc.*, 285 F.2d 8 (6th Cir. 1960). By thus examining both the substantive interest and the means of advancing it, courts have balanced more finely the competing interests involved. The result is a general absence of *per se* rules. In some situations, with very low level supervisors and a close nexus to actual, preexisting work conditions protests, employee strikes may even be protected. *NLRB v. Okla-Inn, supra.*

This approach adopted by the majority of the courts seems to us more reasonable than that advocated by the Board and more consistent with the underlying purpose of the Act. Its thrust is toward recognizing a wider range of issues over which employees may protest and remain protected without unnecessarily infringing upon the legitimate concerns of the employer and exceeding the balance achieved by the Act. The rule advocated by the Board would inevitably encumber the decision whether employ-

---

4. The only exceptions recognized by the Board are those protests which are in contravention of the basic policies of the Act, *see NLRB v. Sands Mfg. Co.*, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939) (strike in breach of collective bargaining agreement), otherwise unlawful, *see Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942) (mutiny under the Criminal Code), violent, *see NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939), or "indefensible", *see NLRB v. Local 1229, IBEW*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (unjustifiable attack on employer's product).

ees may protest at all with a concern that an affirmative holding would legitimate all forms of protest. By so doing, the Board's approach ironically could lead to precluding all forms of employee protest in situations where reasonable forms of protest might otherwise be allowed and protected.

The Board nevertheless contends that the Supreme Court opinion in *NLRB v. Washington Aluminum*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) bars such a finely calibrated reasonableness test. That argument, however, was considered and rejected by the Fifth Circuit in *Dobbs Houses, Inc. v. NLRB, supra,* and rightly so. The Supreme Court's dictum about the irrelevance of the reasonableness of employee protest in *Washington Aluminum* concerned the decision of a group of employees to leave an unheated factory on an extremely cold day in winter. "The conditions there were within the proper realm of employee interest, and the walkout, while extreme under the circumstances, was reasonably related to the complaint." *Dobbs Houses, Inc. v. NLRB, supra* at 539. It could hardly be argued that leaving a cold work place is not a reasonably related means of protesting and avoiding the intolerable conditions left behind. More importantly, *Washington Aluminum* did not involve the peculiar issue of changes in supervisory personnel. This issue in unique in that such changes have only recently been regarded as matters of legitimate employee concern and even then subject to the legitimate claim of employers to a minimum of interference in this area.

▉▉▉▉ We therefore decide to follow the majority approach and look at the overall picture to determine if, as a matter of law, the employee strike was protected activity.[5] On the facts of this case, we find it was not.

While there is evidence to show that Eisenhart was in close contact with the employees, he was not by any means a low level supervisor. Instead, he was part of the upper management of the company. He reported directly to the Executive Director as well as to the president of the board.

The Board argues that the evidence also shows that Eisenhart had become a conduit for the communication and resolution of employee grievances—that the employees' grievances were his grievances. While this fact might have force under other circumstances, in this case the "conduit" function followed upon Eisenhart's confrontation with Bennett and was aimed at the gathering of information to support Eisenhart's prior allegations against the Executive Director.[6] To accord protected status to the employees' actions in this case solely because of the eleventh or twelfth hour information gathering activities would in effect bootstrap a dispute between management personnel into one about the terms and conditions of employment.

Moreover, if, as the Board argues, Eisenhart had assumed the role of handling employee grievances, it only serves to strengthen our finding since the specific language of the Act recognizes the employer's interest in remaining free of employee interference in managerial decisions regarding the selection of personnel for handling employee grievances. § 8(b)(1)(B), 29 U.S.C. § 158(b)(1)(B). *See NLRB v. Puerto Rico Rayon Mills, Inc.,* 293 F.2d 941, 948 (1st Cir. 1961) (Aldrich, J., concurring).

Finally, we come to the critical question of the nexus between the nature of the dispute and the means employed. It may well be that the dispute was brought within the borders of protected activity. If so,

---

**5.** The prior case law in this circuit on this issue is ambiguous. In *NLRB v. Crimptex, Inc.,* 517 F.2d 501, 504 n.5 (1st Cir. 1975) we stated in dictum that strikes in protest of supervisory changes were not as a rule protected. Previously, before the Board itself began to advocate its present position a divided panel held, as an alternative ground in support of its decision, that employees could strike over the discharge of a management appointed "helper". *NLRB*

*v. Puerto Rico Rayon Mills, Inc.,* 293 F.2d 941 (1st Cir. 1961).

**6.** The relationship between Eisenhart's firing and the employees' grievances was thus not like that involved in *NLRB v. Okla-Inn, supra,* where the discharge of the low level supervisor was "the last straw" in causing a walkout which was in fact premised on preexisting, underlying objectionable work conditions.

however, it was only marginally so. Every element in the equation is borderline—the high level of Eisenhart, the absence of any record evidence that he had ever served as a conduit for employee grievances, the origin of the dispute as one solely between Eisenhart and Bennett, the apparent post hoc effort of Eisenhart to bulwark his position by soliciting complaints from staff, the lack of any history of staff dissatisfaction, the irrelevance of much of the Task Force Report and the belated and frenetic setting forth, without any indication of prior interest, of items relevant to working conditions. Whether or not a sick-out and threatened strike might be protected activity in a situation where differences had been more sharply drawn, we cannot say that the development of consensus of grievances here had reached the point where such extreme measures could be justified. To hold otherwise would be simply to legitimate employee resort to extreme sanctions on unpopular decisions involving top personnel so long as after-the-fact efforts were solicited and made to catalogue dissatisfaction with working conditions.

*Enforcement of the Board's order is denied.*