United States Court of Appeals
For the First Circuit


No. 96-1826

YESTERDAY'S CHILDREN, INC.,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.



PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD



Before

Boudin, Circuit Judge, 
Bownes, Senior Circuit Judge, 
and Lynch, Circuit Judge. 



Clare Hudson Payne, with whom Eaton, Peabody, Bradford & 
Veague, P.A. was on brief, for petitioner. 
David B. Schwartz, Attorney, with whom Frederick C. Havard, 
Supervisory Attorney, Frederick L. Feinstein, General Counsel, 
Linda Sher, Associate General Counsel, and Aileen A. Armstrong, 
Deputy Associate General Counsel, were on brief, for respondent.



May 30, 1997


LYNCH, Circuit Judge. The National Labor Relations LYNCH, Circuit Judge. 

Board filed a host of unfair labor practice charges under 8

of the National Labor Relations Act, 29 U.S.C. 158, against

Yesterday's Children. Yesterday's Children is a non-profit

corporation which operates, among other facilities, Agape

House,1 a 20-bed residential nursing home for mentally

retarded adults in Ellsworth, Maine. Evidence was heard in

October 1993 by an Administrative Law Judge, who recommended

dismissal of all the charges, based in part on his

credibility determinations after observing the witnesses.

His decision was reviewed by a three-member panel of the

NLRB.

The case comes here with only two of the various

charges still at issue: charges relating to disciplinary

actions taken against two employees, nursing assistant Laura

Cunningham and charge nurse Jean Smith. As to these two

charges, the Board reversed the ALJ and found that the

employer's actions were illegal because the conduct of the

two employees was protected by 7 of the Act, 29 U.S.C. 

157. Cunningham had been issued a written reprimand for

"conduct unbecoming" after calling a co-worker to enlist her

support in a letter-writing campaign to the employer in

support of a recently discharged supervisor. Smith had been

 

1. During this litigation, the facility's name was changed
from Agape House to Birchwood Living Center.

-2- 2

issued two written reprimands and then discharged,

purportedly for her role in two incidents involving patient

care.

The Board ordered reinstatement and back pay for

Smith and ordered the removal of the reprimands of both Smith

and Cunningham from the employer's files. Yesterday's

Children petitions this court for review, and the General

Counsel cross-petitions, seeking enforcement of the Board

order. We enforce the Smith order, but vacate the Cunningham

order and remand that portion of the case to the Board for

further consideration.

I.

The facts are now largely undisputed. During the

first half of 1992 Laura Cunningham was a nursing assistant

at Agape House, and Smith was a charge nurse2 there.

Cunningham had been working at Agape House since 1988, and

Smith since 1985. In January 1992, Jeffrey Cake was hired as

the Executive Director of Yesterday's Children and the

Administrator of Agape House.

In mid-June 1992, Cunningham and Smith attempted to

start a letter-writing campaign to the employer's Board of

Directors in support of the recently discharged Glenda

 

2. The record does not reveal the specific duties and
responsibilities of charge nurses at Agape House. It appears
that the charge nurse is the head nurse on a given shift,
that is, the person at the facility who is primarily
responsible for the medical care of the residents.

-3- 3

Leavitt. Leavitt is alternately described in the record as

the "Program Director" at Agape House and the "Qualified

Mental Retardation Professional" ("QMRP") at Agape House.3

Leavitt had been fired by Cake on June 11, after a series of

letters from state authorities led Cake to conclude that

Leavitt did not have the required professional qualifications

for the position. At the time of the campaign, Leavitt was

appealing her dismissal to Yesterday's Children's Board of

Directors.

On June 13, Cunningham called Lucinda Sargent,

another nursing assistant, at home from a nursing station

telephone to try to enlist Sargent's support in the letter-

writing campaign. Resolving a factual dispute between

Cunningham and Sargent, the ALJ determined that Cunningham

made the call during her work shift. The Board did not

question this finding. Cunningham made several derogatory

remarks about Cake in the course of this telephone

conversation, referring to him as an "asshole," and saying

that she would like to "get rid of" him. 

 

3. Whatever her title, the record reflects that Leavitt was
in charge of the implementation and development of active
treatment services for the residents. It was her
responsibility to assess, evaluate, and make recommendations
to an interdisciplinary team of employees on goals and
objectives for the residents and to monitor and review those
plans as they were implemented. She was also involved in
employee scheduling. 

-4- 4

Sargent complained to her supervisor, Gayle Haslam,

about the call. Haslam reported the incident to Cake, who

wrote a letter to Cunningham stating that her call to Sargent

"during regular working hours" was, if the facts as reported

to him were accurate, "just cause for dismissal." Cake then

met personally with Cunningham to discuss the incident, and

concluded that Cunningham's effort was directed not at

supporting Leavitt, but at getting him (Cake) fired.

A few days later, Cake sent Cunningham a second

letter which constituted a "formal reprimand" for "conduct

unbecoming." On a contemporaneous "employee counseling

form," Cake noted that he had reprimanded Cunningham for

"using agency resources and time to agitate against the

actions of the administration including attempts to place

undue stress on other staff while on duty." Cunningham was

not fired.4

The conflicts between Cake and Smith ran deeper.

Almost immediately upon Cake's arrival at Yesterday's

Children, the two were at odds. The ALJ traced this enmity

to January 1992, when a group of employees submitted to Cake

 

4. A second unfair labor practice charge regarding
Cunningham involved an alleged "interrogation" of Cunningham
by Cake in response to rumors of a strike in protest of the
firing of Leavitt. Cunningham claimed that Cake threatened
to fire any employee who walked out, but the ALJ credited
Cake's corroborated testimony that he made no such threat.
The Board upheld the ALJ's dismissal of this charge, and the
General Counsel does not press this claim on appeal.

-5- 5

a letter requesting the reinstatement of Liz Martin, an

employee Cake had fired. Smith's name led the list of

signatories.5 Then, in early February, Smith angrily

confronted Cake, in front of another employee, over a memo he

had issued to employees stating that he intended to withhold

paychecks for a week to enable the corporation to ride out a

cash flow crisis. Cake issued Smith an official letter of

reprimand after this incident, which he later withdrew after

Smith explained her views to him in greater detail.

In June, Cake discharged Leavitt, and Smith was

among the employees who supported Leavitt's bid for

reinstatement. Smith and Cunningham initiated a letter-

writing campaign on Leavitt's behalf. Additionally, on July

12, Smith and Leavitt met with representatives of the Office

& Professional Employees International Union regarding

organizing the facility. Then, on July 14, Smith read a

prepared letter in support of Leavitt to the employer's Board

of Directors, which was meeting at a local hotel to hear

Leavitt's appeal of her termination.6 Smith's statement

included sharp criticism of Cake. After discussing the

circumstances of Leavitt's dismissal by Cake, for instance,

Smith claimed "no professionalism was exhibited." She stated

 

5. Cunningham also signed this letter, a fact noted by
neither the ALJ nor the Board. In addition, thirty-one other
employees signed the letter.

6. This appeal was ultimately denied.

-6- 6

that Cake "has managed to frighten [the staff] into

submission and silence by threatening them with lawsuits and

their jobs." Smith also criticized Cake's budget-cutting

decisions, which, she claimed, had caused a deterioration in

the physical appearance of Agape House, posing health hazards

to the residents. During the meeting, the Union distributed

flyers outside on the street. 

Smith was also involved in two patient care

incidents in July 1992. One was denominated the "choking

incident." On July 10, Smith was at the nursing station

talking with Dale Zebulske, Leavitt's replacement as QMRP,

when they heard a brief scuffle a short distance away. After

peering down the hall, Smith said to Zebulske, whose back was

to the incident, "Patient is choking patient ." Smith

claims to have been joking and claims that there had been no

choking at all. Zebulske, however, did not realize she was

joking. Later that day, Zebulske happened to be on the phone

with the mother of the resident he thought was the victim of

the choking attack. Though it was apparently against Agape

House policy,7 he mentioned the incident to the mother, who

later complained to state authorities. Although Smith would

 

7. No explicit findings were made on this point, but the
Board apparently credited Smith's undisputed testimony that
Yesterday's Children policy prohibited anyone other than the
staff social worker, Philip Hurley, from contacting
residents' parents about incidents like the one Zebulske
thought had occurred.

-7- 7

be required to write up an "incident report" in the event of

an incident like the one Zebulske believed occurred, she did

not doso (because,according toher, therehad beenno incident).

On July 16, at the request of Joan Abbott, the

acting Director of Nursing,8 Smith wrote an explanation of

the phantom incident; she said that she had simply remarked

to Zebulske that it "looked like" one of the residents was

"going to choke" the other, but that she had no idea that

Zebulske understood her to be saying that a choking attempt

had in fact been made. (Later, at the hearing, Smith

testified that she had been joking and that she had not

realized that Zebulske was taking her seriously.) On July

21, Goss verbally counseled Smith for her "poor judgment" and

issued a written confirmation of the counseling. Cake signed

off on this written confirmation.

The second patient care episode was denominated the

"sunburn incident." On July 16, a resident returned from an

outing with a serious sunburn on his shoulder. Verna Chick,

a staff member who had been on the outing, reported the

sunburn to Cake and to Smith, who was the charge nurse on

duty at the time. As required, Chick wrote up an "incident

report."

 

8. Abbott, a nurse at Agape House, was filling in
temporarily for Betty Goss, the facility's Director of
Nursing, while Goss was on vacation.

-8- 8

Smith applied another resident's prescription

Silvadene ointment to the sunburn.9 Smith noted this

treatment on Chick's incident report, and also made a

notation in the "24-hour notebook," a notebook in which

nurses on different shifts communicate with each other

concerning patient matters. She did not, however, record the

incident in the "medical logbook" (the book in which

individualized records concerning each resident are kept) and

did not enter it into the "nursing notes" (the formal record

of nursing actions).10 These were both violations of policy.

Later, Smith told Ben Starbuck, the charge nurse in

the next shift (the overnight shift), about the sunburn.

Starbuck checked the resident's sunburn while the resident

slept but took no other action. Starbuck, in turn, claims

that he informed Virginia Conklin, the charge nurse who took

over in the morning, about the sunburn. Conklin later told

Cake she had not been informed of the sunburn, but at the

hearing admitted that she had been told. Some time the next

morning, during Conklin's shift, nursing assistant Sargent

 

9. The state investigators, who came in later, erroneously
concluded that the resident's sunburn went untreated for
sixteen hours. Both the ALJ and the Board found that Smith
had in fact promptly treated the sunburn with Silvadene.

10. After receiving a written reprimand about the sunburn
incident, however (see below), Smith was advised by one of
the state investigators to prepare a late entry in the
nursing notes stating that she had applied Silvadene ointment
to the sunburn. She did this.

-9- 9

(the nursing assistant whom Cunningham had called about

Leavitt) allowed the sunburned resident to get into a hot

whirlpool bath, which caused extreme blistering of the

sunburn. Sargent, who claims that she had not known about

the sunburn, told Conklin about the problem. Conklin then

went to Cake, at which time Conklin denied having been

informed about the sunburn. Conklin then arranged for a

prescription of Silvadene ointment for the resident.

On July 27, three inspectors from the State

Department of Human Services, which had received anonymous

complaints about Agape House, showed up unannounced at the

facility to investigate, inter alia, the two incidents. At 

the end of their visit, the state investigators gave Goss a

hand-written list of deficiencies. Several shortcomings were

noted, including the sunburn incident (but not the choking

incident). The listed deficiencies were: (1) failure

properly to treat a resident for an ear infection; (2)

treatment of a resident with a psychotropic drug without the

consent of his guardian; (3) failure to establish proper

procedures for the use of two psychotropic drugs; and (4)

failure to treat a sunburn for sixteen hours. An official

letter of violation followed on August 19, materially

identical to the July 27 hand-written list.

On July 28, Smith, along with fifteen other

employees, attended a Union organizing meeting and signed an

-10- 10

authorization card. The next day, Goss told Cake about the

meeting, but it is unclear from the record whether she told

him, or he otherwise discovered, that Smith was among the

employees who had attended the meeting.

On August 4, Goss issued Smith two separate written

reprimands for her role in the sunburn incident and the

choking incident. The choking incident reprimand stated that

James Barnes, one of the state inspectors, "was very

concerned about the issue of your judgement [sic] and not

satisfied with the administrators [sic] recommendations of

counseling." However, Barnes testified before the ALJ and

denied having ever expressed any such dissatisfaction. The

sunburn incident reprimand stated that Smith's "failure to

note [the sunburn] within [the patient's] medical records or

examine him carefully, resulted in his being placed in the

whirlpool . . . ." The letter went on to state that Smith

"failed to properly act, both in terms of record keeping and

in terms of making recommendations to the nurse assuming duty

after [her] shift."

On August 10, Smith was fired. The discharge

letter from Cake cited her conduct in the sunburn and choking

incidents and her lack of "consistent good judgment."

Smith's appeal of her termination to the board of directors

was denied.

II.

-11- 11

Because the employer asserts that there is not

substantial evidence supporting the Board's unfair labor

practice determinations, and because the Board and the ALJ

reached contrary conclusions, it is helpful to understand the

opinions of the Board and of the ALJ.

Cunningham 

The ALJ found that Cake "honestly" believed that

Cunningham, in calling Sargent, was agitating for his

dismissal. This aspect of the call, said the ALJ, was what

"bothered Cake the most." The ALJ found that the phone call

"was clearly divorced . . . from any activity under the Act"

both because it was made on company time using company

resources (the nursing station phone) and because of

Cunningham's derogatory remarks about Cake. Hence, the

letter of reprimand from Cake, concluded the ALJ, though it

"may have not been completely appropriate," was "not

unlawful."

On appeal, the Board, without analyzing whether

Cunningham's call was protected by 7,11 ruled that it did

 

11. Section 7 provides, in relevant part, that:
Employees shall have the right to
self-organization, to form, join, or
assist labor organizations, to bargain
collectively through representatives of
their own choosing, and to engage in
other concerted activities for the
purpose of collective bargaining or other
mutual aid and protection . . . .
29 U.S.C. 157.

-12- 12

not lose the protection of the Act because it was made on

company time or because of the derogatory remarks. The Board

reversed the ALJ, finding that the employer violated

8(a)(1).12

The remarks about Cake, said the Board, were "not

so egregious as to cause her to lose the protection of the

Act." The prime focus of Cunningham's efforts, reasoned the

Board, was not to get Cake fired but was to get Leavitt

reinstated, adding:

[E]mployees who are engaged in Section 7
activity in protest of actions by their
employer do not lose the protection of
the Act simply because they mention that
they dislike an employer manager and
would like to see the manager discharged.

The Board stressed that there is no evidence that Cunningham

took any affirmative steps to get Cake fired.

Without discussing whether an employee's use of

company time and company resources to engage in the kind of

activity at issue here might justify a reprimand, the Board

stated that the employer had failed to establish that it

disciplined Cunningham for this reason. The disciplinary

action, said the Board, was in response to the offensive

remarks, not to Cunningham's use of company resources, and,

on these facts, this was impermissible.

 

12. Section 8(a)(1) provides: "It shall be an unfair labor
practice for an employer to interfere with, restrain, or
coerce employees in the exercise of rights guaranteed in
[ 7]." 29 U.S.C. 158(a)(1).

-13- 13

Smith 

The Board's General Counsel asserted that Smith was

fired for her engagement in activities protected under 7 of

the Act. In contrast, the employer argued that she was fired

for her poor judgment and breach of proper protocol. The ALJ

employed the Wright Line burden-shifting paradigm in his 

analysis. See Wright Line, 251 N.L.R.B. 1083 (1980), 

enforced, 662 F.2d 899 (1st Cir. 1981). He found that the 

General Counsel had failed to "make a prima facie showing

sufficient to support the inference that conduct protected

under the Act was a motivating factor" in Smith's reprimands

and discharge. The ALJ found that "Smith's actions in the

'choking' and 'sunburn' incidents did prompt, in part the

state investigation" and that this, "together with Cake's

personal dislike for Smith," resulted in the reprimands and

termination. Thus, the burden never shifted to the employer

to show that the punishment would have occurred even in the

absence of protected conduct and the analysis ended there.

The ALJ concluded that there was no unfair labor practice.

The Board, on appeal, reversed, finding a violation

of 8(a)(1) under the same Wright Line burden-shifting 

analysis. The elements necessary to make out a prima facie

case, stated the Board, are "protected activity, knowledge,

timing, and animus." The Board said that all these elements

were met here. Smith engaged in a variety of protected

-14- 14

activities; the employer knew about her engagement in these

activities; her reprimands and her termination were in "close

proximity" to the employer's learning about her protected

activities; and the employer's animus "toward Smith's

protected activities in particular, and its employees'

protected activities in general, is clear."

The Board agreed with the ALJ that Cake had acted

out of a personal dislike for Smith, but disagreed about the

import of this fact:

Cake's dislike of Smith arose initially
from Cake's resentment of Smith's
protected activities. . . . Thus, as
Cake's dislike began from animosity over
protected activity, we infer that this
"dislike" was a product of animus toward
Smith's protected activity.

Thus, the Board found that the General Counsel successfully

made out his prima facie case.

The burden then shifted, on the Board's analysis,

to Yesterday's Children to show that it would have

disciplined and discharged Smith even if she had not engaged

in protected activities. The Board found that the employer's

proffered explanation -- that Smith failed to show

"'consistent good judgment in [her] duties and

responsibilities' with respect to the 'sunburn' and choking'

incidents" -- was pretextual, and that the employer had

"failed to show that it would have taken the same action in

the absence of Smith's protected activity."

-15- 15

With regard to the "choking incident," the Board

noted that Zebulske, who violated company policy by informing

the resident's mother about the phantom incident, was at

least equally responsible for the state investigation, and

yet was not disciplined at all. Additionally, the August 4

reprimand from Goss explained, in light of the fact that

Smith had already been scolded on July 21 for her role in the

incident, that further reproach was in order because Barnes,

one of the state investigators, was concerned about the issue

of Smith's judgment and dissatisfied with the leniency of the

counseling. Barnes, however, testified at the hearing that

he had stated no such concern or dissatisfaction.

Regarding the "sunburn incident," the Board

challenged Cake's explanation that Goss issued the reprimand

to Smith on August 4 based on the state investigators'

report, which found that Smith had engaged in "abuse" by

neglecting to treat the resident's sunburn. The Board, in

discrediting this explanation, noted that the report did not

issue until August 19, after the reprimand and after the

discharge.13 Additionally, while the state investigators'

 

13. The Board misread the record. The state investigators,
on the day of their investigation, July 27, gave Cake a hand-
written list of deficiencies, which foreshadowed their formal
findings. The sunburn incident was listed among the
deficiencies on this note: "Client suffered a sunburn
resulting in blisters on left shoulder and not treated for
over 16 hours." The formal letter, dated August 19,
reiterated: "[C]lient sustained a sunburn on 7/16/92, while
at day program, which resulted in blisters to his left

-16- 16

report referenced by Goss's letter of reprimand listed

various deficiencies at Agape House, the Board noted that

only Smith was disciplined in response to these deficiencies.

In conclusion, the Board said:

[H]aving found that the General Counsel
established a prima facie case warranting
an inference that Smith was reprimanded
and subsequently discharged for her
protected concerted activity, and having
found that [Yesterday's Children's]
explanations for its actions were
pretextual and that the actual reason for
Smith's reprimands and discharge were her
protected concerted activities, we
conclude that [Yesterday's Children]
violated Section 8(a)(1) by reprimanding
and subsequently discharging Smith.

III.

Our standard of review for decisions of the Board

is a deferential one. "As the Board is primarily responsible

for developing and applying a coherent national labor policy,

we accord its decisions considerable deference." NLRB v. 

Boston Dist. Council of Carpenters, 80 F.3d 662, 665 (1st 

Cir. 1996) (internal citation omitted). We may not

substitute our judgment for the Board's when the choice is

 

shoulder. The physician was not notified and treatment was
not administered until 7/17/92." The criticisms in the two
writings are fundamentally the same; the formal letter
contained no new details. The Board therefore erred in
determining that the employer could not have relied on the
state investigators' findings on August 4 and August 10.
The investigators' citation erroneously stated that
Smith failed to treat the sunburn. In fact, she did treat
it, but with another resident's prescription ointment. In
either event, she violated nursing policy.

-17- 17

"between two fairly conflicting views, even though the court

would justifiably have made a different choice had the matter

been before it de novo." Universal Camera Corp. v. NLRB, 340 

U.S. 474, 488 (1951). This is not to say, however, that we

simply "rubber stamp" the decisions of the Board. See Kelley 

v. NLRB, 79 F.3d 1238, 1244 (1st Cir. 1996). We enforce a 

Board order only if the Board correctly applied the law and

if its factual findings are supported by substantial evidence

on the record. Acme Tile & Terrazzo Co. v. NLRB, 87 F.3d 

558, 560 (1st Cir. 1996); Boston Dist. Council of Carpenters, 

80 F.3d at 665; see N.L.R.A. 10(e), 29 U.S.C. 160(e). 

We address separately the Board's two findings of

unfair labor practices.

Cunningham 

There can, of course, be no violation of 8(a)(1)

by the employer if there is no underlying 7 conduct by the

employee. Conduct must be both concerted and protected to

fall within 7. In finding a 8(a)(1) violation, however,

neither the Board nor the ALJ analyzed the issue, a close one

in this case, of whether Cunningham's concerted activity was

protected by 7. This compels a remand to the Board for

further consideration.

The ALJ found that:

Cunningham's phone call to Sargent was
improper because it was a personal call
made during working time from the nursing
station phone, rather than the employee's

-18- 18

phone. But what bothered Cake the most,
understandably, was the derogatory
remarks made about him . . . . That part
of Cunningham's call to Sargent regarding
support for Leavitt could be considered
protected concerted activity, if taken
alone, but other aspects of the call
(which bothered Cake the most) clearly
divorced the call from any activity
protected under the Act.

The Board, in reversing the ALJ and finding a

violation of 8(a)(1), misinterpreted the ALJ's reasoning

and in so doing "glossed over the analytically tough question

presented here." NLRB v. Auciello Iron Works, Inc., 980 F.2d 

804, 811 (1st Cir. 1992). The Board stated that the ALJ

"found that Cunningham's efforts on behalf of Leavitt were

concerted and protected," but that

[c]ontrary to the [ALJ], we do not find
that Cunningham's activities lost the
protection of the Act either because (1)
the conversation contained derogatory
remarks about Cake, or (2) the
conversation alluded to the discharge of
Cake, or (3) the telephone call was made
during working time from the nursing
station.

The difficulty with the Board's position is that the ALJ did

not find that Cunningham's action was protected; he simply 

posited that even if her act were protected it would lose its 

protection because of the manner in which she acted.

The end result is that neither the ALJ nor the

Board addressed the basic legal issue underlying whether

Cunningham's phone call was protected by 7: Leavitt's

-19- 19

undisputed status as a "supervisor"14 and the special

standards under 7 pertaining to employee protests of the

employer's supervisor-related actions.

The General Counsel argues that the Board properly

understood the ALJ's analysis. This assertion is undermined,

however, by the ALJ's failure even to mention Leavitt's

status as a supervisor, let alone that such status was

relevant to the 7 inquiry. The ALJ, on our reading of his

decision, did not find that Cunningham's call was protected

by the Act, and the Board erred in concluding that the

conduct was protected without undertaking the appropriate

legal analysis. The correct analysis, as both parties

implicitly recognized, must begin with the fact that Leavitt

was a "supervisor" for purposes of the Act, see N.L.R.A. 

2(11), 29 U.S.C. 152(11), and that Cunningham's phone

call was at best an employee protest about a supervisory

staffing matter.

It is fundamental to the structure of the Act that

"not all forms of employee protest over supervisory changes

are per se protected." Puerto Rico Food Prods. Corp. v. 

NLRB, 619 F.2d 153, 155 (1st Cir. 1980); Abilities & Goodwill 

Inc. v. NLRB, 612 F.2d 6, 8-10 (1st Cir. 1979); see also NLRB 

v. Sheraton Puerto Rico Corp., 651 F.2d 49, 51 (1st Cir. 

 

14. The General Counsel concedes this point. Additionally,
Zebulske, Leavitt's replacement as QMRP, is clearly viewed by
the General Counsel as a member of management.

-20- 20

1981) ("[W]hen non-supervisory employees engage in activity

directly related to the retention of supervisors . . . the

Board must proceed with caution."). Section 7 shields

employees from hostile employers when the employees seek,

through union membership or otherwise, to band together for

the purpose of "mutual aid or protection." The guiding

policy behind 7 is not implicated when supervisors, who are

management's "faithful agents," are the ones concertedly

agitating against the employer's actions. Sheraton Puerto 

Rico, 651 F.2d at 51 (quoting H.R. Rep No. 245, 80th Cong., 

1st Sess. 16-17 (1947)); see N.L.R.A. 2(3), (11). And, 

similarly, the policy is not clearly implicated when non-

supervisory employee concerted activity concerns supervisory

staffing matters. "Traditionally, the interest of the

employer in selecting its own management team has been

recognized and insulated from protected employee activity."

Abilities & Goodwill, 612 F.2d at 8; see also NLRB v. Oakes 

Mach. Corp., 897 F.2d 84, 89 (2d Cir. 1990) ("Employee action 

seeking to influence the identity of management hierarchy is

normally unprotected activity because it lies outside the

sphere of legitimate employee interest.").

We have held that two basic criteria must be met

for employee concerted action regarding supervisory staffing

matters to gain the protection of 7. Puerto Rico Food 

Prods., 619 F.2d at 155; Abilities & Goodwill, 612 F.2d at 8- 

-21- 21

10. "First, the employee protest over a change in

supervisory personnel must in fact be a protest over the

actual conditions of their employment," and second, "the

means of protest must be reasonable." Puerto Rico Food 

Prods., 619F.2d at155-56 (internal quotationmarks omitted).15 

Because the Board did not analyze this key issue,

we vacate the Cunningham order and remand to the Board for

further consideration. See NLRB v. Acme Tile & Terrazzo Co., 

984 F.2d 555, 555 (1st Cir. 1993) (per curiam); see also Acme 

Tile & Terrazzo, 87 F.3d at 560; cf. NLRB v. Food Store 

Employees Union, 417 U.S. 1, 9-10 (1974); Sullivan Bros. 

Printers, Inc. v. NLRB, 99 F.3d 1217, 1231 (1st Cir. 1996). 

"[T]the task of defining the scope of 7 is for

the Board to perform in the first instance as it considers

the wide variety of cases that come before it." NLRB v. City 

Disposal Sys., Inc., 465 U.S. 822, 829 (1984) (internal 

 

15. This test, which traces back at least half a century,
has been fashioned through an interplay between the Board and
the courts of appeals. See, e.g., Phoenix Mut. Life Ins. 
Co., 73 N.L.R.B. 1463 (1947), enforced, 167 F.2d 983 (7th 
Cir. 1948); Guernsey-Muskingum Elec. Coop., Inc., 124 
N.L.R.B. 818 (1959), enforced, 285 F.2d 8 (6th Cir. 1960); 
Dobbs Houses, Inc., 135 N.L.R.B. 885 (1962), enforcement 
denied, 325 F.2d 531 (5th Cir. 1963) (enforcement denied 
because employee acts in support of discharged supervisor not
"reasonable"); Abilities & Goodwill, Inc., 241 N.L.R.B. 27, 
enforcement denied, 612 F.2d 6 (1st Cir. 1979) (employee acts 
not reasonable due to lack of nexus between dispute and means
of protest); Oakes Machine Corp., 288 N.L.R.B. 456 (1988), 
enforced in relevant part, 897 F.2d 84 (2d Cir. 1990). The 
Board is not free to ignore its own precedent. Auciello, 980 
F.2d at 812.

-22- 22

quotation marks omitted). But "[a] court may require that

the Board's decision 'be supported by articulate, cogent, and

reliable analysis.'" Auciello Iron Works, 980 F.2d at 813 

(quoting Northport Health Servs., Inc. v. NLRB, 961 F.2d 

1547, 1553-54 (11th Cir. 1992)). If the Board believes that

Cunningham's call to Sargent in support of Leavitt was

protected by 7, it should explain its reasoning. See 

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 

167-68 (1962). In particular, the Board should explain how

Leavitt's termination relates to the non-supervisory

employees' working conditions.

Of course, every dispute over
managerial employees involves working
conditions to some degree; after all, the
jobs of many managers in large part
involve creating and maintaining such
conditions. Yet . . . there must be a
somewhat more direct relationship than
this to the concerns of ordinary workers
before concerted action aimed at the
choice of managers enjoys the Act's
protection.

Sheraton Puerto Rico, 651 F.2d at 53; see also Puerto Rico 

Food Prods., 619 F.2d at 156-57. 

We do not reach the issue -- about which the ALJ

and the Board are in apparent disagreement -- of whether

Cunningham's conduct, if initially protected, would be

stripped of its protection because of her derogatory comments

about Cake and/or the fact that she made the call during her

working shift from a company phone. We note only that, as a

-23- 23

conceptual matter, an employee's act or course of conduct

certainly could lose the protection it would otherwise have

enjoyed under 7 because of the "abusive manner" in which

the employee behaved. City Disposal Sys., 465 U.S. at 837; 

El Gran Combo de Puerto Rico v. NLRB, 853 F.2d 996, 1006 (1st 

Cir. 1988); Keosaian v. NLRB, 630 F.2d 36, 38 (1st Cir. 1980) 

(per curiam).

Smith 

1. Motion to Amend Pleadings 

We address first a threshold issue in the Smith

claim. Yesterday's Children asks that the Smith case be

remanded to the Board with instructions to allow Yesterday's

Children to raise the argument, not made before the ALJ or

the Board, that Smith is a "supervisor" under the Act, see 

N.L.R.A. 2(11), instead of an "employee," see N.L.R.A. 

2(3), and that as such she lacks the protections accorded

employees under 7. See generally Sheraton Puerto Rico, 

651 F.2d 49. The Smith claim, if this argument were to carry

the day, would fail ab initio. 

Yesterday's Children attempted to raise this

argument before the ALJ, but failed due to procedural

default. It now argues that the ALJ erred in denying its

post-hearing motion to amend its answer, and that the Board

erred in upholding this erroneous ruling. We review a denial

of a motion to amend the pleadings for abuse of discretion.

-24- 24

Golas v. HomeView, Inc., 106 F.3d 1, 3 (1st Cir. 1997); Reid 

v. New Hampshire, 56 F.3d 332, 342 (1st Cir. 1995); see also 

Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 792 (1st 

Cir. 1995).

We place the matter in context. Yesterday's

Children moved, almost two years into the litigation, to

amend its answer in order to deny that Smith is an

"employee." Relying on an intervening Supreme Court

decision, NLRB v. Health Care & Retirement Corporation of 

America, 114 S. Ct. 1778 (1994), Yesterday's Children sought 

to assert the affirmative defense that Smith, as a charge

nurse, is a "supervisor."

There were, at the time, various NLRB proceedings

occurring simultaneously involving this employer. One of

these proceedings (RC-19849) involved the certification of a

claimed bargaining unit which included the facility's charge

nurses. In this proceeding, the employer took the position

that the charge nurses were supervisors under the Act, rather

than employees. But the Regional Director, to whom the NLRB

had delegated its authority pursuant to 3(b) of the Act, 29

U.S.C. 153(b), found to the contrary on September 29, 1992.

The employer petitioned the NLRB for review of this decision.

In light of the adverse ruling in the certification

case, but before the NLRB had yet acted on the request for

review, the employer chose not to deny that Smith was an

-25- 25

employee in its November 19, 1992 answer to the complaint in

this unfair labor practice case. Shortly thereafter, on

December 14, 1992, the NLRB turned down the employer's

request for review of the Regional Director's finding in the

certification case. The ALJ conducted the three-day hearing

in this unfair labor practice case in early October 1993.

Then, before the ALJ issued his decision, the Supreme Court

decided Health Care on May 23, 1994, after which the employer 

sought to amend its answer on June 22. The ALJ, in a

footnote to its written opinion in this case, issued eight

days later on June 30, denied the motion without explanation,

and the Board affirmed the denial on untimeliness grounds.

In defense of this ruling, the General Counsel

cites the basic proposition that "an intervening court

decision that suggests a new and previously unmade argument

to a respondent is not a circumstance that excuses a failure

to raise the argument before an administrative agency at the

time appropriate under the agency's practice." True

enough,16 but at the same time it is not entirely fair to

characterize the employer's argument here as "new and

 

16. See, e.g., United States v. L.A. Tucker Truck Lines, 
Inc., 344 U.S. 33, 36-37 (1952); NLRB v. International Health 
Care, Inc., 898 F.2d 501, 507 (6th Cir. 1990); Szewczuga v. 
NLRB, 686 F.2d 962, 971 (D.C. Cir. 1982). But see Sure-Tan, 
Inc. v. NLRB, 467 U.S. 883, 896 n.7 (1984) (deeming 
"substantial change in controlling [case] law" an
"extraordinary circumstance," and thus allowing employer to
raise a new argument not raised before the Board).

-26- 26

previously unmade." The broader reality is that this same

respondent had unsuccessfully raised an identical argument in

a recent and related case before the same administrative

body.

Still, while the issue is a close one, the denial

of the motion was not an abuse of discretion. Significantly,

the NLRB had not yet ruled, at the time of the employer's

initial filing of its answer in this case, on the employer's

petition for review of the Regional Director's earlier ruling

on the charge nurses' non-supervisory status. The fact that

the employer itself had sought review of the Regional

Director's decision, and that this request was pending at the

time the answer here was filed, shows that the employer did

not regard the Regional Director's decision as a final agency

determination. The employer should have preserved the

argument in this case by raising it in the pleadings.

2. Merits 

Both the ALJ and the Board assumed without inquiry,

for the purpose of the Wright Line analysis, that Smith had 

engaged in a range of protected activities before being

disciplined by the employer: Smith's signing a letter to

Cake seeking the reinstatement of a co-worker, Liz Martin;

her confrontation with Cake over Cake's decision to withhold

employee paychecks; her initiation of the Leavitt letter-

-27- 27

writing campaign; her appearance before the employer's board

of directors on Leavitt's behalf; and her two meetings with

Union organizers. The Board found that Cake fired Smith

because he did not like her, and that this dislike "arose

initially from [his] resentment of [her] protected

activities." Thus, concluded the Board, she was fired

because of her protected activities. 

We discount two of Smith's activities that the

Board deemed protected because they were done in support of

Leavitt. The Board's analysis is flawed in precisely the

same way as its analysis of Cunningham's conduct. However,

Smith's other cited activities -- the Martin letter, the

paycheck dispute, and the Union activity -- are obviously

protected. They provide sufficient evidence in the record to

uphold the inference drawn by the Board that Cake disliked

Smith because of her engagement in protected activities. The

Board's view that Cake was, in effect, discharging Smith for

her involvement in these protected activities is a reasonable

one. See National Ass'n of Letter Carriers, 315 N.L.R.B. 

1176, 1178 & n.10 (1994) (if employer's animus towards

employee begins in response to employee's protected act,

Board will presume later animus derives from same unless

contrary evidence presented).

The employer argues that it has met its Wright Line 

burden because it would have disciplined Smith anyway, even

-28- 28

absent the protected activities, for her involvement in the

choking incident and the sunburn incident. Cake based the

August 10 letter of dismissal largely on the two August 4

letters of reprimand for those two incidents. If the two

letters of reprimand are pretextual, it follows, as the Board

recognized, that the letter of dismissal is also pretextual.

We address the two incidents in turn, concluding that there

is sufficient support for the Board's position that both

letters are pretextual.

Smith's joke about an attack by one resident

against another was clearly a breach of professional

judgment, especially since Zebulske, the person to whom she

made the facetious remark, had only begun working at Agape

House four days earlier and may not have known Smith well at

this time. The Board, in calling it a "nonevent," blithely

understated the seriousness of the incident.17 The possible

choking of one resident by another is not a joking matter.

However, the fact remains that both the timing of the August

4 letter of reprimand and the explanation offered by the

employer for the discipline raise suspicions.

Smith had already been verbally counselled by Goss

on July 21 about her role in the choking incident. Cake had

 

17. The General Counsel is equally cavalier about the
choking incident, claiming that Zebulske's decision to tell
the resident's mother was the "sole cause" of the
controversy.

-29- 29

recommended this counseling, and he signed off on the

counselling form. This level of discipline apparently

satisfied him for two weeks. The matter appeared to be

closed, until it was reopened by the August 4 letter.

The employer's stated reasons for increasing the

discipline on August 4 were that Smith's breach of judgment

had, in part, led to the state investigation and that one of

the investigators was dissatisfied with the leniency of the

July 21 counselling. Both explanations by the employer are

undercut by the record. The investigators' hand-written

statement of deficiencies made no mention of the choking

incident (nor did the formal letter of citation that

followed). The statement in the August 4 letter that the

regional advocate, Barnes, was "not satisfied" with the prior

disciplinary measure is even more directly contradicted by

the evidence. In testimony before the ALJ, Barnes stated

that, while he was aware of the choking incident and had

discussed it with Cake, he did not express dissatisfaction

withthe informalcounselling orrecommendadditional discipline.

Additionally, the employer took no disciplinary

action against Zebulske, who shared responsibility with Smith

for the scandal. It was Zebulske who, contrary to company

policy, informed the resident's mother of the alleged

choking. The existence of disparate treatment for similar

misconduct can support a finding of improper motive. See 

-30- 30

Wyman-Gordon Co. v. NLRB, 654 F.2d 134, 141 (1st Cir. 1991). 

Given the employer's implausible explanations and

the disparate treatment of Smith and Zebulske, the Board's

conclusion that the August 4 reprimand was pretextual is

supported by substantial evidence in the record.

The sunburn incident, like the choking incident,

raises serious concerns about patient care. The story is

troubling in two distinct ways. First, while the resident

was promptly treated, the treatment was with someone else's

prescription ointment and the treating nurse, Smith, failed

to create complete records. Second, the resident was allowed

the next morning to get into a hot whirlpool bath, which

caused severe blistering. Clearly, patient care was

compromised even before the whirlpool, and Smith is squarely

to blame for this. Nevertheless, there is substantial

evidence in the record to support the Board's conclusion that

the employer's August 4 letter of reprimand to Smith for the

sunburn incident was pretextual.

The August 4 letter states that Smith's "failure to

note [the sunburn] within [the patient's] medical records

resulted in his being placed in the whirlpool." The ALJ

found, however, that Smith, despite making incomplete

treatment records, personally informed Starbuck, the

-31- 31

overnight charge nurse, about the resident's sunburn.18 And

Starbuck, in turn, told Conklin, the charge nurse who came on

duty in the morning. It was on Conklin's watch that nursing

assistant Sargent allowed the sunburned resident to get into

the hot bath.

The employer does not challenge these findings of

fact. It is clear that either Conklin or Sargent -- and not

Smith -- was to blame for the resident's being allowed to get

into the whirlpool. This fault is at least equal to Smith's

fault. But only Smith was disciplined for the sunburn

incident. While the employer was undoubtedly justified in

disciplining her for her role in the incident, the employer

has failed to explain why no one else was disciplined too.

This disparate treatment is telling. See Wyman-Gordon, 654 

F.2d at 141.19

Like us, the Board viewed this as a disparate

treatment case, but the Board also relied on the fact that

 

18. Smith also made a notation in the "24-hour notebook,"
the notebook in which nurses at Agape House communicate with
each other across shifts. The August 4 letter is somewhat
disingenuous, then, in stating that Smith "failed to properly
act, both in terms of record keeping and in terms of making
recommendations to the nurse assuming duty after [her]
shift."

19. Additionally, a few weeks after Smith's dismissal
another nurse at Agape House was reprimanded, but not fired,
for applying Silvadene to a sunburned resident without a
prescription. This too is reflective of disparate treatment.
However, a year before Smith's discharge, a nurse was fired 
for the more serious offense of giving a seizure medication
to a resident without a prescription.

-32- 32

the employees responsible for the four other deficiencies

cited by the state investigators were not disciplined by

Yesterday's Children. The employer has convincingly argued

that these other deficiencies were systemic problems for

which no individual employees were at fault. Our focus,

consequently, is on the other employees responsible for the

sunburn incident. While our disparate treatment analysis

differs somewhat from the Board's, we think that the Board's

ultimate conclusion of pretext is a reasonable one.

Because we conclude that there is substantial

evidence in the record to support the Board's inference that

the employer's discipline of Smith for both the choking

incident and the sunburn incident was pretextual, the Board's

Smith order is enforced. For reasons discussed above, the 

Board's Cunningham order is vacated and her case is remanded 

to the Board for further consideration.

-33- 33