**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**SHERATON PUERTO RICO CORP.,
d/b/a Puerto Rico Sheraton Hotel,
Respondent.**

**No. 80–1657.**

United States Court of Appeals,
First Circuit.

Argued April 6, 1981.
Decided June 11, 1981.

W. Christian Schumann, Atty., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Washington, D.C., were on brief, for petitioner.

Roger S. Kaplan, New York City, with whom William A. Krupman, Andrew A. Peterson and Jackson, Lewis, Schnitzler & Krupman, New York City, were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BREYER, Circuit Judges.

BREYER, Circuit Judge.

This case is before the court upon the application of the National Labor Relations Board for enforcement of its April 1, 1980 order issued against Sheraton Puerto Rico Corp.[1] The Board found that Sheraton violated section 8(a)(1) of the National Labor Relations Act by discharging four employees, two of whom Sheraton claimed were supervisors, for signing a letter to the president of Sheraton protesting working conditions at the Puerto Rico Sheraton Hotel under General Manager Arnold Orenstein and requesting Orenstein's dismissal. The text of the letter is reprinted in full in Appendix A to this opinion. The Board also found that Sheraton violated section 8(a)(1) by discharging seven supervisory or managerial employees for their participation in the letter where the discharges tended to interfere with employees' rights under sec-

---

1. 248 N.L.R.B. 113 (1980).

tion 7.[2] The Board's order requires Sheraton to cease and desist from the unfair labor practices found and from interfering with employees' statutory rights. The Board's order also requires Sheraton to reinstate and make whole the 11 discharged individuals and to post an appropriate notice. Because we find a lack of substantial evidence that sending the letter was activity protected by section 7, we deny enforcement of the Board's order.

## I.

The facts of this case are essentially undisputed. In August 1974 Arnold Orenstein was appointed general manager of the Puerto Rico Sheraton. At that time the hotel was failing and had an accumulated loss of over $11 million. By 1977, the hotel was reporting an annual profit of over $1 million. Yet there was discord among the managerial staff. In March 1977, several supervisory employees met, discussed two recently circulated anonymous letters hostile to Mr. Orenstein, and decided to draft an open letter, criticizing him, that would be sent to his superiors in Boston. After consulting an attorney, they formed a steering committee with themselves as members. The committee was composed of:

| | |
|---|---|
| Ramon Castro | Credit Manager |
| Armando Gutierrez | Executive Assistant Manager |
| Rodrigo Rodriguez | Banquet Sales Representative |
| Fofito Vasquez | position unidentified in the record [3] |

They then drafted the March 25 letter—printed in Appendix A—with the help of two more supervisory employees:

| | |
|---|---|
| Angel Gutierrez | Guest Service Manager |
| Joan Rodriguez | Reservations Manager |

On March 25, at a meeting at Fofito Vasquez's house, the committee met with various supervisory and non-union non-supervisory employees seeking signatures. Ultimately, they obtained 22 signatures; 4 were written at the bottom of the last page of the letter; and 18 were written on a blank piece of paper attached to the letter. The signed copies were sent on March 29 to the president of the Sheraton Hotel Corporation and three other chain executives.

The letter itself, as a reading of it will verify, starts by listing eight factors apart from Mr. Orenstein's work that helped the hotel become profitable. It then lists eight problems: (1) inadequate communication between Mr. Orenstein and the hotel staff, "communication being the basis of a sound, strong management", (2) "innovations for better management" are discouraged, (3) an insufficient number of staff meetings, (4) Mr. Orenstein's "closed door policy", (5) "promotions, salary scales and working conditions ... includ[ing] company car, expense account, room and board" which discriminate against employees with Spanish surnames, (6) cost control that is too stringent, to the point where one must have Mr. Orenstein's approval "for rubber bands or pencils", (7) persons in key positions being given responsibility without adequate authority, (8) an inadequate plan for selling the hotel's services to the public. The letter concludes by suggesting that Mr. Orenstein be replaced.

When Mr. Orenstein heard about the letter, he called in those who had signed it, determined to his satisfaction that many of the employees did not know of (or would not stand by) its contents, and fired those that did for "insubordination", by which term he says he meant their failure to come to him before writing to his superiors. In addition to the five supervisors previously mentioned, he fired two other supervisory employees:

---

**2.** The Board also found that Sheraton violated section 7 by coercively interrogating and threatening to discharge employees and by discriminatorily denying access to the hotel's public areas to dischargees.

**3.** Fofito Vasquez is not an alleged discriminatee. The only information about him in the record is that he was discharged at approximately the same time the eleven alleged discriminatees were discharged for threatening to "kill" Orenstein, a threat he made while brandishing a pipe in a dispute with Personnel Director Mario Perez.

| | |
|---|---|
| Francisco Acevedo Padilla | Guest Service Manager |
| Amos Langer | Head Waiter |

two persons who the hotel claims were supervisors but the Administrative Law Judge found were not:

| | |
|---|---|
| Victor Pena | Food Clerk |
| Edgardo Pena | Engineering Supervisor |

and two secretaries:

Bonnie Salvador

Carmen Bermudez.

A few days after these discharges, which took place around April 11, Mr. Orenstein sent a memorandum to all employees, discussing the "events of last week where several supervisory people were dismissed." In the memorandum he likened himself to a ship's captain faced with a mutiny and made clear he expected those with similar complaints in the future to come to him before writing to the firm's president. (The text of this memorandum is set out in Appendix B.)

On the basis of these facts, the two documents, and very little other testimony, the Administrative Law Judge found that bettering employee working conditions was a significant object of the March 25 letter, that the writing and sending of the letter was "legitimate concerted activity by employees for mutual aid and protection" protected by section 7 of the National Labor Relations Act, and that discharging the supervisors would discourage ordinary employees from engaging in legitimate concerted activity. The Board accepted the Administrative Law Judge's findings and ordered reinstatement of the seven supervisory, and four ordinary, employees.

## II.

Before determining whether the Board's findings are adequately supported and within the bounds of the law, we note that the essential problem of this case stems from the fact that most of those concerned are supervisors. We therefore must begin with the Taft-Hartley Act, a specific determination by Congress to reverse the NLRB's (and the Supreme Court's) holding that supervisors might fall within the Labor Act's protections. *See Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). That Act amended the National Labor Relations Act's definition of "employee" to exclude "any individual employed as a supervisor", 61 Stat. 137, 29 U.S.C. § 152(3). It defined "supervisor" broadly, 61 Stat. 138, 29 U.S.C. § 152(11), and it added that employers could not be forced to deem "supervisors" to be "employees" for the "purpose of any law . . . related to collective bargaining", 61 Stat. 151, 29 U.S.C. § 164(a). The House Report on the amendments stated that "Management, like labor, must have faithful agents", adding that "no . . . employer . . . need have as his agent one . . . whom for *any* reason, he does not trust". H.R.Rep.No. 245, 80th Cong., 1st Sess. 16–17 (1947). (Emphasis in original.) And, the Senate Report spoke of the employer's need for "undivided loyalty". S.Rep.No. 105, 80th Cong., 1st Sess. 5 (1947). The Supreme Court has held that these amendments excluded supervisors from the protections of the Act "because supervisors were management obliged to be loyal to their employer's interests . . . ." *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 659–60, 94 S.Ct. 2023, 2026, 40 L.Ed.2d 443 (1973); *see also Florida Power & Light v. Electrical Workers*, 417 U.S. 790, 806, 94 S.Ct. 2737, 2745, 4 L.Ed. 477 (1974). Thus, the Board is without power to protect concerted activities of supervisors (at least where they are related to legitimate supervisory activities). And, as this court pointed out in *Abilities and Goodwill, Inc. v. NLRB*, 612 F.2d 6 (1st Cir. 1979), when non-supervisory employees engage in activity directly related to the retention of supervisors or to supervisory activities, the Board must proceed with caution.

In *Abilities and Goodwill* we held that a one-week (non-supervisory) employee "sick-out" was not protected when it was engaged in to protest the firing of a supervisor—despite the preparation by the employees of a "report" that (to some extent) sought to relate their actions to their working conditions. We looked at all the circumstances—including the reasonableness of the means of protest, the extent to which

the supervisor had daily, or direct, contact with employees and their working conditions, and the origin of the dispute that led to the supervisor's discharge—before concluding that the employee action was not "in fact a protest over the actual conditions of the employment". *Abilities and Goodwill, Inc. v. NLRB*, 612 F.2d at 9. In *Puerto Rico Food Products Corp. v. NLRB*, 619 F.2d 153 (1st Cir. 1980), we reversed an NLRB holding that non-supervisory employees could stop work on an assembly line to demand an explanation of why their supervisor had just been fired. We held that the means of protest about such matters must not only be reasonable but also directly related to their actual conditions of employment. We noted that employees were more legitimately concerned with low-level, than with high-level supervisors, but that the impact of such supervisors on working conditions must be special, or at least "distinct from the effect which supervisors usually have on employees", and that the critical issue was that of "the employees subjective state of mind". *Id.* at 156–57.

Given the legal standards set forth in these prior cases, the Board order at issue here must be denied enforcement, for there is not substantial evidence in the record that the protest at issue here—reasonable as it was in respect to means—concerned the actual conditions of non-supervisory employment. That is to say, there is no evidence of impact on non-supervisory employees over and above that likely to exist whenever managers dispute about managerial activities. Although a few workers joined their supervisors in signing the letter, the record suggests that this was a protest of supervisors, by supervisors, and about supervisors.

First, those who originated the March 25 letter were supervisors. Those who assisted them in drafting it were supervisors. Non-supervisory employees were called in and asked to sign it only after it was completed. This would be a different case had non-supervisory employees written the letter, participated significantly in its drafting, or even had the drafting taken place after

consultations with them, for any such facts would have provided evidence that this was an *employee*, rather than a supervisor's protest.

Second, the letter itself had only one object: the removal of Mr. Orenstein as the hotel's general manager. Mr. Orenstein was not a "low-level foreman or supervisor who deals directly with the employees", *cf. Abilities and Goodwill, Inc. v. NLRB*, 612 F.2d at 8, but, rather, the highest ranking officer at the hotel. Thus, management's interests in securing his loyalty, and maintaining his authority are unusually strong, while the interest in extending the National Labor Relations Act's protection to concerted employee activity related to his tenure of office is correspondingly weak (at least absent a distinct showing of a particular harmful effect on employee working conditions as perceived by employees).

Third, the complaints contained in the letter are almost exclusively managerial. They are complaints of lower level managerial staff about higher level managers. The list, taken at face value, particularly in light of its origin, describes inadequate managerial communication; lack of managerial innovation; insufficient management meetings; inaccessibility of the manager; discriminatory salaries, perquisites, promotions, cost controls; inadequate authority for subordinate managers; and a poor marketing plan. Even when the letter speaks of "promotions, salary scales and working conditions", it immediately uses as examples "company car, expense account, room and board". At least the first two of these do not sound as if they concern the ordinary worker. The occasional use of the words "working conditions" and the fact that some of the words used *could* refer to ordinary workers as well as managers are not enough to transform a letter that is managerial in tone and content into a letter that deals with the direct concerns of the average worker.

Fourth, the record testimony does not lead one to reread the letter as more "worker oriented" than it appears. To the con-

trary, the four non-supervisory employees who testified said nothing at all about concern with *their* working conditions. Rather, they spoke of the matter as being one "of principle", or they claimed that the letter was "self-explanatory". Nothing that they said supports the notion that the protest involved was primarily, or even in significant part, one of non-supervisory workers, or that the non-supervisory employee signatories interpreted the letter, in whole or in part, as protesting their employment conditions.

Fifth, of the employees discharged, seven were managers, two were arguably supervisors, and only two were undisputedly non-supervisory employees. Orenstein testified without contradiction that he did not fire any employees who he believed had signed the March 25 letter because they thought they were *protesting working conditions.* He fired only those whose motive, in his view, was his own removal as general manager.

The Administrative Law Judge, whose views the Board adopted, based his conclusion that a significant "object of the March 25 letter was the betterment of working conditions of employees" upon three pieces of evidence: (1) the text of the letter itself; (2) the testimony of three supervisors; and (3) Mr. Orenstein's April 20th memorandum indicating that the letter writers' concerns should have been directed to him and not to President James. The first of these has been discussed and is set out in Appendix A. A review of the testimony of the three supervisors, with one exception, reveals that they were concerned with *their* working conditions, not those of non-supervisory workers. The one exception is testimony of Reservations Manager Joan Rodriguez to the effect that she spoke to Mr. Orenstein about employee complaints and morale, that Mr. Orenstein's managerial methods made life unusually difficult for secretaries and that many employees had to work longer hours than the personnel director worked. In the context of two volumes of testimony including that of four non-supervisory employees, these few words simply do not seem sufficient to comprise substantial evi-

dence—particularly when the four non-supervisory employees who testified did not directly relate the protest to their working conditions. The third piece of evidence—the letter or memorandum of April 20—is set out in Appendix B. That memorandum confirms, rather than refutes, the view that the dispute was essentially managerial and supervisory.

The facts reveal here a case very different from *NLRB v. Phoenix Mutual Life Insurance Co.*, 167 F.2d 983 (7th Cir.), *cert. denied*, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948) and from *NLRB v. Guernsey-Muskingum Elec. Co-op., Inc.*, 285 F.2d 8 (6th Cir. 1960), in both of which, courts allowed the NLRB to protect conduct related to the selection of a supervisor. In both *Phoenix Mutual* and *Guernsey-Muskingum* the employees' means of protest were reasonable—the writing of letters and the voicing of complaints (as the means used here were reasonable). In both cases, however, the deciding courts made clear that the protest at issue was one that originated with, and was conducted by, *non*-supervisory employees for reasons directly related to their own (*non*-supervisory) conditions of work. In the first of these cases insurance agents initiated a letter related to the choosing of a cashier. In the second, a group of laborers complained about the way in which their new foreman dealt with them on the job. Neither of those cases presents a dispute originated by, and primarily involving, supervisors, and both of them involved protests more directly related to ordinary employee working conditions than that at issue here.

Of course, every dispute over managerial employees involves working conditions to some degree; after all, the jobs of many managers in large part involve creating and maintaining such conditions. Yet, we have previously held that there must be a somewhat more direct relationship than this to the concerns of ordinary workers before concerted action aimed at the choice of managers enjoys the Act's protection. *See, e. g., Puerto Rico Food Products Corp. v. NLRB*, 619 F.2d at 155. Moreover, it was

Congress' clear intent to place those disputes that are *primarily* among managers in the hands of management to resolve. This cannot be done if supervisors are allowed to immunize their own protest activities simply by adding a few sympathetic non-supervisory employees to their protesting group.

Finally, we do not believe that Mr. Orenstein's post-discharge memorandum converted his actions into a generalized threat against non-supervisory employee protests. The memorandum (set out in Appendix B) suggests to us that Mr. Orenstein believed (and made clear to others) that he was faced with a "revolt of the managers". While we recognize an obligation to defer to the Board's expertise in this area, *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 267, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975), we nonetheless are unable to find any reasons in the record for casting the memorandum in a more "anti-employee" light than an ordinary reading of it would indicate. (The record, if anything, suggests the contrary.) Indeed, the Board's finding that, on this record, the supervisors must be reinstated to avoid injury to non-supervisory employees does not suggest to us that there is more of an anti-employee nature here than meets the eye, but, rather, like the thirteenth chime of the clock, casts doubt on that which went before.

Because we cannot find record support for the view that this case involves more than a dispute among managerial employees into which several non-supervisory employees were drawn,

*Enforcement of the Board's order is denied.*

## APPENDIX A

March 25, 1977

Mr. Howard P. James
Chairman and President
The Sheraton Corporation
470 Atlantic Avenue
Boston, Mass. 02210

Dear Mr. James:

The purpose of this letter is to inform you about the reality of the working conditions at the Puerto Rico Sheraton.

It is a known factor that our hotel has been losing money. This has been a situation that we all have tried very hard to change. During the past year our losing ratio has been greatly reduced. This has, besides hard work, come about because of the following:

A. The beginning of the American economic recovery.

B. An unprecedented cold winter this year in the continental United States.

C. Unstable conditions in Jamaica.

D. Massive advertisement campaign by the Puerto Rican Tourist Development Co.

E. Worldwide marketing exposure on T. V. via satellite sponsored by major local commercial and industrial firms.

F. An already noticeable improvement in our laborers' attitude toward the tourist, due in part to sad memories of the past economic recession.

G. Main office efforts to increase better working conditions.

H. Our individual efforts and experience based on our deep sense of pride and responsibility towards our hotel, our Island and our families.

If all these causes are not taken into consideration when you study our financial statements, you could arrive at the wrong conclusion that our losing ratio could not have been reduced even more, or to the really tremendously wrong conclusion that, the reduction of the losing ratio was due to the efficiency or expertise of the present manager of the hotel or further that a peaceful working relationship has been existing between him and the hotel staff.

The following is a non all inclusive list of serious problem areas existing and caused exclusively by the lack of knowledge, tact and professionalism of Mr. Arnold M. Orenstein, who we think is to be held accountable for the present and worse to come precarious working conditions.

A. Lack of bilateral communication between the manager and the hotel staff; communication being the basis of a sound, strong management. The expressions of ideas, suggestions or complaints are answered by "if you do not like it, leave".

B. Innovations for better management are all but prohibited.

C. Staff meetings are seldom called and have become monologues where discussion is not accepted and the information from the manager has to be numbly and most of all silently received.

D. The executive or manager's office is run on a closed door policy. An appointment is mandatory unless you are called for a scolding session.

E. The promotions, salary scales and working conditions to include: company car, expense account, room and board, among others, that have so far been established clearly represent that they are discriminatory against employees, with Spanish surnames. So far corrective measures have not been sought but could, should this situation worsen.

F. The principle of controlling expenses in the hotel is sui generis. A request of rubber bands or even pencils is supposedly more efficiently controlled by the need of the general manager's approval. On the other hand up to a couple of months ago we had the most glorified chief engineer this hotel has ever afforded. This person not only was grossly overpaid but also, as you probably know by now, did not perform for what could be considered, the best interest of the hotel. This reminds us of the "Pennywise and Dollar foolish" theory.

G. Most of the key positions, except top management, are overloaded with responsibilities yet these individuals' performances have been impaired because commensurate authority has not flowed downwards.

H. The marketing plan of this hotel, it's nowhere to be seen or found, it rests on one person's mind. The General Manager has stated that "He does not believe in it and after all it is not important". Here we have Hit & Miss management; which at best, shows his almost total lack of concern for the Corporation's policies, procedures and authority.

We, the undersigned, feel, that this enumeration which is based strictly on professional and business points clearly shows that something has to be done by you immediately if we are to work united for the betterment of our institution, and more, if this institution is to survive. The avoidance of what could have been determined or classified as personality problems or individual complaints is not to be constituted as a showing of their non-existence.

We sincerely hope that we have expressed our feelings, worries and fears. We feel, further, that if we have all been able to reduce our losing ratio working under these poor human relations conditions that have, and are still prevailing, our chances for business improvement are infinite if the General Manager is substituted for someone who could bring up everybody's morale and esprit de corps.

Good Human Relations go hand in hand with Productivity and Profitability. They are your insurance policy for a good working organization which we all want and deserve.

Hoping that this letter receives the importance it deserves.

We remain

APPENDIX B

MEMORANDUM

April 20, 1977

FROM: Arnold M. Orenstein

TO: All Employees

Many of you are aware of the events of last week where several supervisory people were dismissed.

So that you will be aware of what has happened I will briefly review the events:

1—In early March an unsigned letter was sent from the hotel to the President of the Sheraton demanding that I be removed from the hotel and threatening that if it wasn't done by March 31st there would be "a big problem at the hotel," as well as "*big trouble* for me."

I had a good idea of who sent the letter and by certain actions the group of people behind the first letter felt they had to send another letter. This time they signed it.

2—In this second letter they claimed that they didn't like the way the hotel was run and implied that they could do it better and that I must be removed. They claimed that the hotel was doing better for various reasons and that it had nothing to do with my being here.

I do *not* claim to be the best hotel manager in the world. I do want you to know that when I arrived here for the last months of 1974 the hotel was in terrible condition and finished the year with a loss of 3¼ million dollars. Guests would choose Sheraton as a last choice when there was no space elsewhere, the hotel was in disrepair, the casino was closed and many employees lost their jobs. In early 1975 the Sheraton Corporation saw no improvement in business and expenses and they decided to try to sell the hotel or close it, but in the meantime to cut all possible losses. Many more people were laid off, the Zanzibar closed, the Alhambra closed and all advertising was stopped.

The only thing we continued to do was write and call personal contacts here and in the States who could assist in giving us business. We were very fortunate in getting the Skylark Charter program for early 1976 plus the Chevrolet groups for late 1975 and March 1976.

This forecast of high occupancy and reduced losses made Sheraton decide to keep the hotel open after they bought the property in 1975. By June 1976 the company saw that our losses were cut substantially. We had gotten lots of winter and spring business, the Steak Penthouse had opened and was a great success. The only reason we were allowed to open the Steak Penthouse was that we needed more than a coffee shop for the winter, and it cost very little to set up the restaurant. The plan was to close it if it lost money. Fortunately it was well accepted by tourists and the local community.

Plans to sell or close the hotel were dropped when the company saw that we would end 1976 with only a $½ million loss, a contract for Skylark again in 1977, plus other business.

We had plans to lease the casino so that we would have an additional attraction for guests so they wouldn't check out and go elsewhere. These plans fell through, but after much arguing with our friends in heaven (the President of Sheraton and his staff), we convinced them to allow us to run the casino which is now an attraction helping us to entertain our guests and bring in revenue.

In all probability, barring wars, hurricanes, and other Acts of God we will make a small profit this year. More employees are working and the future of the hotel is looking brighter. This is important to you, the people who have worked hard, given good service and cooperated wherever you had to.

Fortunately the service employees of the hotel are more aware of what they have to do to put rice and beans on their families' tables than certain other people here who felt they were more privileged than others. They felt they could do as they pleased for their own personal benefit, and even their own personal entertainment in violation of house rules and policy. They didn't like the controls and reporting procedures and because I established these procedures they didn't like me!!

Whatever I have tried to do in this hotel has been for the good of the hotel. I have lived in Puerto Rico for 11 years and don't plan to leave. The 11 years is longer than most of the ringleaders of this group have lived here!!

A hotel is like a ship. There is only one captain. If some of the crew creates a mutiny they have to be eliminated before the ship sinks. You can also compare this to cancer. If someone has it you operate on it before the patient dies.

Many of you, especially the delegates, have never hesitated to come here and personally ask for favors. Even some of those who were discharged were accorded favors which we did not have to do. The door still remains open to you.

One last comment, . . . . . you have heard that there were 22 employees discharged. That is *not* correct. There were several people tricked into signing the letter. They were given blank paper to sign and were told it was a petition to request a meeting with me to discuss improved benefits for non-union employees. They did not know what they were signing and after we determined who these people were we did not discharge them. There were a few people who were discharged because of signing who I really am unable to determine what their complaint was.

In any case these people did not see fit to come to me with their complaint but rather wrote to our President to demand my removal. This constitutes insubordination and is just cause for dismissal.

There is no need to go into further details but just to point out how juvenile all of this was one of these people was heard to make threatening remarks against my son and against me.

I will look forward to your continued support and understanding as well as to good future business. Thank you.

AMO/ggc