PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SMITHFIELD PACKING COMPANY,
INCORPORATED,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent.*

No. 06-1541

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

SMITHFIELD PACKING COMPANY,
INCORPORATED,

*Respondent.*

No. 06-1652

On Petition for Review and Cross-application
for Enforcement of an Order of
the National Labor Relations Board.
(11-CA-20240)

Argued: September 27, 2007

Decided: December 5, 2007

Before WILLIAMS, Chief Judge, DUNCAN, Circuit Judge, and
Raymond A. JACKSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Petition for review granted; cross-application for enforcement granted
in part and denied in part by published opinion. Chief Judge Williams
wrote the opinion, in which Judge Duncan and Judge Jackson joined.

**COUNSEL**

**ARGUED:** Gregory Branch Robertson, HUNTON & WILLIAMS, Richmond, Virginia, for Smithfield Packing Company, Incorporated. Heather Stacy Beard, Office of the General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board. **ON BRIEF:** Kimberlee W. DeWitt, Kurt G. Larkin, HUNTON & WILLIAMS, Richmond, Virginia, for Smithfield Packing Company, Incorporated. Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Steven L. Sokolow, Deputy Associate General Counsel, David Habenstreit, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

---

**OPINION**

WILLIAMS, Chief Judge:

Smithfield Packing Company, Incorporated ("Smithfield") petitions for review of an order of the National Labor Relations Board (the "Board") finding Smithfield in violation of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1) (West 1998 & Supp. 2007) (the "Act"), for threatening, beating, and falsely arresting employees of Smithfield's independently contracted cleaning services company, QSI, Inc. ("QSI"), on the morning of November 15, 2003. Because we conclude that the employees in question were not engaged in concerted protected activity within the meaning of § 7 of the Act, 29 U.S.C.A. § 157 (West 1998), we grant Smithfield's petition for review. In addition, we grant the Board's cross-application for enforcement of its order with respect to a separate § 8(a)(1) violation that Smithfield chose not to include in its petition for review.

I.

A.

Smithfield is among the largest pork products companies in the world and is well-known for its "Smithfield Ham." Among its many

operations, Smithfield currently runs a large hog-slaughtering production facility in Tar Heel, North Carolina (the "Plant"). The Plant is the largest of its kind in the world and employs between 5,500 and 6,000 workers. By comparison, the largest town in Bladen County, the predominantly rural county in which the Plant is located, has a population of less than 4,000 people.

The Plant operates from roughly 8 a.m. to 11 p.m. each day with coverage provided by two production shifts. The third shift is a cleaning shift, during which time the Plant is thoroughly cleaned and then inspected by agents from the United States Department of Agriculture ("USDA"), who must certify that the facility is clean before the next day's production shifts may begin. Since the Plant's opening in 1992, Smithfield has hired independent contractors to handle these cleaning services. In July 2002, Smithfield awarded the contract for these cleaning services to QSI, which succeeded Mossburg Sanitation ("Mossburg"). During each cleaning shift, QSI staffed the Plant with between 250 and 300 workers, almost all of whom were of Hispanic descent, and many of whom spoke only Spanish. Although the cleaning shift ended at 7 a.m., as an incentive to promote efficiency, QSI permitted its employees to leave early but still receive full pay if they finished their work early.

Although Mossburg and QSI were competitors, QSI retained many of Mossburg's supervisors in similar positions. For example, QSI's Plant Manager, Manuel Plancarte, who was responsible for overseeing QSI's operations during the cleaning shift, had served as the Associate Plant Manager for Mossburg.[1]

QSI's safety department, which was also present at the Plant during the cleaning shift, and was headed by Mayra Saucedo, did not report to Plancarte. Instead, the safety department reported principally to QSI's Area Manager Eduardo Guzman, Safety Director Lane Parsons, and Division Manager Owen Patterson.

---

[1]Plancarte himself was also related to several individuals serving under his watch. Two of his cousins, Antonio Cruz and Jorge Rodriguez, served as supervisors for QSI. Those three men were reared in the same household by another employee, Juan Hernandez Velasquez. Cruz was Velasquez's son.

By November 2003, tensions at the Plant were rising, pitting the employees and their supervisors against the safety department. QSI employees were upset with their treatment by the safety department and, from time to time, voiced their objections to their supervisors. Plancarte and another supervisor, Antonio Cruz, were particularly sympathetic to these complaints, and, in fact, Cruz would decline to discipline his employees when requested to do so by the safety department for what he deemed minor safety infractions. For example, on November 7, Saucedo requested that Cruz discipline an employee for a safety violation, but Cruz refused. In response, Saucedo telephoned Patterson and complained about Cruz's refusal to follow her discipline requests. In addition, Saucedo informed Patterson that she believed Cruz had come to work inebriated on several occasions. On one occasion when she smelled alcohol on his breath, she attempted to take Cruz for an alcohol screening test, but he refused to go.

Armed with this information, Patterson decided to terminate Cruz for his continued insubordination. Patterson contacted Guzman, who was off-site visiting one of the other five plants he was responsible for managing, and instructed him to return to Smithfield and escort Cruz from the premises. Guzman followed these instructions, terminating Cruz and removing him from the Plant. About an hour later, and apparently at Plancarte's urging in response to Cruz's termination, QSI employees began walking off the job. Saucedo telephoned Patterson to report the development; in turn, Patterson again contacted Guzman and told him to return to Smithfield and get the employees back to work. When Guzman arrived, he found a large number of employees lingering in the Plant's parking lot, and, after speaking with several employees, Guzman learned that they were upset with Cruz's dismissal and what they viewed as unfair treatment by the safety department.

At that point, Guzman removed Saucedo and her two associates from the plant and terminated them.[2] After this event, some employees returned to work while others went home. Because of the walkout, QSI did not finish its cleaning work that evening, and the USDA did

---

[2] Owen Patterson later rescinded these terminations, but none of the safety personnel returned to the Plant in their former capacity.

not permit the Plant to open for production on November 8. As a result, Smithfield lost its entire production for that day.

On November 10, prior to the start of QSI's cleaning shift, around 140-150 QSI employees met in front of the Plant with Guzman and Patterson to discuss the employees' concerns.[3] The employees requested: (1) a $1 per hour raise for all employees; (2) the removal of QSI's safety personnel; and (3) the reinstatement of Cruz and another recently terminated employee, Ruben Baltazar. In a hand-written agreement that was written in Spanish, Guzman and Patterson assented to these demands. It is undisputed that all three requests were carried out by QSI.

Although QSI employees returned to work without incident on November 10, Patterson, along with other senior QSI managers, decided to fire a majority of the Plant's supervisors, including Plancarte and Cruz, for their failure to support management during the events of November 7 and 10. Patterson, after consultation with Lane Parsons, decided that Patterson, Parsons, and Guzman should travel to the Plant to conduct the terminations on the morning of November 15. QSI brought in replacement supervisors to step in following the terminations.

As a courtesy, QSI informed Robert Claiborne, Smithfield's third-shift supervisor, that it would be conducting the terminations on November 15 and requested the use of a conference room. Claiborne agreed to let QSI use a conference room and then informed Danny Priest, Chief of the Smithfield Special Police,[4] about QSI's plans. In

---

[3]The impetus of the November 10 meeting was a meeting Plancarte held at his home sometime between November 8 and November 10. During this meeting, Plancarte registered his distaste for QSI and his desire to help Mossburg regain the cleaning contract with Smithfield.

[4]Smithfield had a special police force certified under North Carolina's Company Police Act, N.C.G.S. § 74E. The Smithfield Special Police is comprised of four full-time and two reserve officers; the officers wear primarily black uniforms with Smithfield Special Police company insignia. Under the Company Police Act, these officers have the same authority within their "jurisdiction" (the Plant) as police officers throughout the State. In addition, the Smithfield Special Police fell under the same strictures as police officers throughout the state in terms of using excessive force. Smithfield also employed unarmed security guards throughout the plant, primarily at entrances and exits. These guards wore gray uniforms.

response, Priest increased his staffing for the November 14-15 shift, placing several officers in the visitors' lobby outside of the conference room where QSI was terminating the supervisors and placing several others on standby to patrol the Plant's parking lot.

Beginning at around 3:00 a.m. on November 15, Patterson and Parsons instructed Guzman to enter the production area of the Plant and gather the supervisors who were to be terminated. QSI decided to conduct the terminations in groups: Plancarte was terminated in the first group of supervisors, and Cruz was to be terminated in the third group. At some point after the first group of supervisors were terminated but prior to his own termination, Cruz became aware that Plancarte had been terminated and that QSI was also terminating other supervisors. At the time, he had not been informed that he was about to be terminated. Nonetheless, Cruz began encouraging employees in the production area to leave their posts because Plancarte had been fired. Some employees complied and began heading towards the exits, although trial testimony was unclear why these employees left. Most indicated that they were upset that QSI was terminating people like Plancarte who were sympathetic to their complaints; however, others simply decided to follow the workers they saw heading off the job. Cruz himself began running through the Plant and shouting at the employees to leave their posts.

At this point, events are hotly disputed. For our purposes, it is sufficient to note that a large number of QSI's employees moved, in a somewhat chaotic fashion, from the production areas through a set of double steel doors to the employee lobby, and then into the parking lot, where they congregated. After some time, the employees either returned to work or went home.

In terms of objective evidence regarding the events of November 15, we note that two criminal charges were filed. First, Priest arrested employee Roberto Munoz-Guerrero in the parking lot, at least thirty minutes after the employees had dispersed and after announcements were made requesting the employees to return to work or go home. Munoz-Guerrero was booked on charges of resisting arrest at Bladen County Magistrate's Office because, according to Priest, he resisted an officer's request to leave the premises. The charge was later dismissed.

Cruz filed the other criminal charge, which was premised on a fanciful story to say the least. According to Cruz, Patterson saw Cruz on the production floor and began running after Cruz in an effort to apprehend him. Cruz, as mentioned, had not been terminated at this point or even informed that he would be terminated. Cruz originally testified in a workman's compensation hearing that he believed Patterson had a large six-inch knife in his hand and was going to stab him. In this case, Cruz testified that he never saw a knife, just a "shiny object." (J.A. at 264). Regardless, before Patterson reached Cruz, two employees, Munoz-Guerrero and Pablo Zacarias, turned their high-pressure hoses on Patterson, knocking him down. Eventually, according to Cruz, Patterson tracked Cruz down and forcibly removed him from the Plant. Cruz left, but he returned to the Plant later that morning to file an assault charge against Patterson with the Special Police.

B.

As a result of the events on November 15, the United Food & Commercial Workers International Union ("the Union") brought a charge against Smithfield and QSI, alleging that both violated § 8(a)(1); in Smithfield's case, the Union charged that Smithfield violated § 8(a)(1) by threatening, beating, and falsely arresting employees. The Board, after reviewing the Union's filings, issued two complaints alleging: (1) that Smithfield violated § 8(a)(1) of the National Labor Relations Act; and (2) that QSI violated numerous sections of the Act.[5] The Board's complaint did not list the victimized employees or identify the Smithfield personnel alleged to have committed the offending acts. Smithfield requested and was granted a hearing before an Administrative Law Judge ("ALJ").

Prior to the trial before the ALJ, Smithfield moved to sever the two complaints and filed a Motion for a Bill of Particulars, arguing that the Board's complaint included insufficient evidence to permit Smithfield to defend itself properly. The ALJ denied both motions. During trial before the ALJ, the Board broke down its complaint into several different charges, alleging that Smithfield violated § 8(a)(1) by: (1) assaulting QSI employees on the morning of November 15; (2) threat-

---

[5]QSI has since settled its claims with the Board and is discussed only as relevant to our disposition of Smithfield's petition for review.

ening QSI employees with immigration charges on the morning of November 15; (3) falsely arresting QSI employee Roberto Munoz-Guerrero on the morning of November 15; and (4) refusing to grant a transfer request to Smithfield employee Dan English because of English's union activities.

Both the Board and Smithfield put forth numerous witnesses and documentary evidence before the ALJ. In addition, Smithfield entered into evidence a security video from the employee lobby. The video, recorded in a quad-screen split, showed the employee lobby for the duration of the events of November 15. At the time Smithfield moved to enter the video, the ALJ opined that "45 minutes of a tape sounds a little onerous to me," (J.A. at 2097), but permitted entrance of the entire tape into evidence. After the parties stipulated that the relevant portion of the tape was from 2:45 a.m. to 4:00 a.m., the ALJ did watch that portion of the video.

Following the trial, the ALJ issued a written decision finding that Smithfield violated § 8(a)(1) of the Act by threatening and assaulting QSI employees on November 15 and by falsely arresting Munoz-Guerrero on November 15. The ALJ also concluded that Smithfield violated § 8(a)(1) by refusing to consider Dan English for a job opening because of his union activities. As a remedy, the ALJ instructed Smithfield to cease and desist from threatening, assaulting, and falsely arresting QSI employees and from refusing to consider employees for job openings based upon their union activities.

In reaching its conclusion that Smithfield violated the Act, the ALJ first ruled that the November 15, 2003 walkout by QSI employees was protected activity under § 7 of the Act. As the ALJ explained, "[e]mployees who walk out in protest of the discharge of a supervisor are engaged in protected concerted activity and are protected by Section 7 of the Act." (J.A. at 19A.) The ALJ concluded that the walkout "originated with the employees" (J.A. at 19A), although it admitted that there was "some support for the conclusion that certain of the QSI's management at the plant were so motivated and were instrumental in urging the production employees to engage in [the walkout]." (J.A. at 20.) In addition, the ALJ concluded that the walkout "was peaceful and a reasonable means of protest under the Act." (J.A. at 19A.)

The ALJ further concluded that Smithfield violated § 8(a)(1) by assaulting QSI employees, threatening them with immigration proceedings, and falsely arresting Munoz-Guerrero. The ALJ did not explain why it credited the testimony of the Board's witnesses over Smithfield's, noting only that the videotape was "incomplete" and "distorted." (J.A. at 17A.) The ALJ found that the portion of the video shown in court was unhelpful because "[t]he record bears out that the vast majority of the 150 plus employees left prior to this in a frenzied manner following . . . efforts to prevent them from leaving the production area." (J.A. at 17A.) In addition, the ALJ universally credited the testimony of the employees as "bolstered by the testimony of Smithfield's security guards," (J.A. at 17A), noting "inconsistencies" in the employee testimony but finding the "crux" of the testimony consistent. (J.A. at 17A.) For instance, the ALJ credited the testimony of one QSI employee, Ebdin Perez, that he was taken to a dark room, beaten, taken out the back door and almost stuck in a trash can. Although the ALJ considered this "bizarre," he "noted the short physical stature of Perez and f[ound] it would be possible to put him inside of a large trash can." (J.A. at 18.) Without discussing the testimony of Smithfield's witnesses, the ALJ nonetheless noted that in a prior case "Chief Danny Priest was found to have engaged in violence perpetrated upon employee union supporters." (J.A. at 18.)

Smithfield appealed the ALJ's decision to the Board, arguing: (1) that the November 15, 2003 walkout was not a protected activity; (2) that, assuming the walkout was a protected activity, it was unreasonable; and (3) that the ALJ's credibility determinations were in error. The Board issued a unanimous opinion on April 28, 2006 upholding the ALJ's ruling and adopting its findings of facts and conclusions of law. In its opinion, the Board clarified the ALJ's reasoning in some respects relevant to our review. First, the Board noted that the ALJ considered whether the walkout was a reasonable means of protest and ruled that "consistent with the Supreme Court's decision in *N.L.R.B. v. Washington Aluminum Co.*, the Board has not imposed a reasonable means requirement on employees' concerted activity." (J.A. at 56 (quotation marks omitted.)) The Board held in the alternative, however, that even if it were to apply a reasonableness standard to employee concerted activity taken in response to the termination of supervisors, "[it] would affirm" because "a main impetus of the walkout was Respondent QSI's discharge of Supervisor Cruz." (J.A. at

56.) Because Cruz's rehiring had been part of the November 10 agreement, his termination on November 15 permitted the employees to "reasonably conclude[ ] not only that QSI had reneged on its agreement but also that further discussion with QSI was an ineffective means of protest." (J.A. at 57.) The Board further noted that "the employees had no bargaining representative to present their grievances to QSI." (J.A. at 57.) Smithfield filed a timely petition for review of the Board's order, and the Board filed a cross-application for enforcement of the portion of its order finding Smithfield in violation of § 8(a)(1) for a separate incident explained below. We have jurisdiction under § 10(e) of the Act. 29 U.S.C.A. § 160(e) (West 1998 & Supp. 2007).

## II.

### A.

In its petition for review, Smithfield raises three issues: (1) that the Board denied due process by failing to inform Smithfield of the charges against it;[6] (2) that the employees' walkout on November 15 was not protected activity under § 7; and (3) that substantial evidence does not support a finding that Smithfield violated § 8(a)(1). For the reasons that follow, we conclude that the walkout by QSI employees

---

[6]Smithfield's argument that its due process rights were violated stems from the Administrative Law Judge's denial of Smithfield's Motion for a Bill of Particulars. In denying that motion, the ALJ concluded the Board's complaint was sufficient to put Smithfield on notice of the charges against it because Smithfield should have possessed the relevant information regarding which of its employees were at the Plant that evening. We do not see how this action violated Smithfield's due process rights. Simply, "due process is not offended if an agency decides an issue the parties fairly and fully litigated at a hearing." *Yellow Freight System, Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir. 1992). Such a result inures because "[w]hen parties fully litigate an issue they obviously have notice of the issue and have been given an opportunity to respond." *Id.* Here, as is perhaps apparent from the remainder of our discussion, Smithfield ably litigated each issue raised in the Board's complaint, indicating that it had sufficient notice and opportunity to respond.

on November 15 was not protected activity under § 7 and therefore we grant Smithfield's petition for review.[7]

Our standard of review in this context is a familiar one. The Board's legal interpretations are entitled to deference. *Holly Farms Corp. v. N.L.R.B.*, 517 U.S. 392, 409 (1996). Thus, we must defer to the Board where it has chosen "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). And the Board's decisions are to be upheld if its factual findings are supported by substantial evidence. *Id.* at 493. This standard means the Board's factual findings are to be upheld "even though we might have reached a different result had we heard the evidence in the first instance." *N.L.R.B. v. Gen. Wood Preserving Co.*, 905 F.2d 803, 810 (4th Cir. 1990) (internal quotation marks omitted). Moreover, we note that substantial evidence is "more than a scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

Section 7 of the Act provides protection to "[e]mployees" who engage in "concerted activities for the purpose of collective bargain-

---

[7]We also briefly note that, even if we were to conclude the walkout was protected activity, substantial evidence does not support the Board's conclusion that Smithfield violated § 8(a)(1). 29 U.S.C.A. § 158(a)(1) (West 1998 & Supp. 2007). Instead, a review of the record before the ALJ leads to the inescapable conclusion that the ALJ offered, at best, conclusory reasons for accepting the employees' version of events. And, of course, "[w]here an ALJ provides no more than a generalized, conclusory statement purportedly incorporating a host of individual comparative credibility determinations with respect to multiple witnesses, we refuse to indulge the presumption that its findings are entitled to the ordinary deference." *Be-Lo Stores v. N.L.R.B.*, 126 F.3d 268, 279 (4th Cir. 1997). For instance, the ALJ's treatment of the video bordered on the absurd. After indicating that viewing even 45 minutes of video of the relevant events was a hardship, the ALJ then found that the video displayed the incorrect time frame even though (1) the parties stipulated that the tape showed the relevant time frame; and (2) the entire video was in evidence for the ALJ to watch.

ing or other mutual aid and protection." 29 U.S.C.A. § 157 (West 1998 & Supp. 2007). The Act "is not meant to be used offensively as a sword—to discourage one's employer from making an impending layoff. The Act instead seeks to provide a shield—to protect employees who wish to band together and engage in concerted activity for their mutual benefit." *TNT Logistics of N. Am., Inc. v. N.L.R.B.*, 413 F.3d 402, 407 (4th Cir. 2005). Section 8(a)(1) implements the protections of § 7 by declaring "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [§ 7]." 29 U.S.C.A. § 158(a)(1). Of course, "[t]here can . . . be no violation of § 8(a)(1) by the employer if there is no underlying § 7 conduct by the employee. Conduct must be both concerted and protected to fall within § 7." *Yesterday's Children, Inc. v. N.L.R.B.*, 115 F.3d 36, 44 (1st Cir. 1997).

The ALJ concluded that the QSI employees engaged in concerted protected activity on November 15 because "[e]mployees who walk out in protest of the discharge of a supervisor are engaged in protected concerted activity and are protected by Section 7 of the Act." (J.A. at 19A.) The ALJ further found that the walkout itself "was peaceful and a reasonable means of protest under the Act." (J.A. at 19A.) The Board adopted the ALJ's first conclusion, but rejected the notion that the means of protest must be reasonable. In the alternative, however, and recognizing that "certain Federal courts of appeal consider the reasonableness of the employees' means of protest," the Board found the walkout reasonable. (J.A. at 56.)

With respect for the Board's views, we believe its conclusion that all employee action taken in response to the discharge of a supervisor is protected under § 7 is an unreasonable construction of the Act. Instead, as § 7 makes clear, although the protections of the Act extend to employees, those protections *do not* extend to supervisors, who are explicitly excluded by virtue of the Taft-Hartley Act. Indeed, supervisors are not protected under the Act for good reason: "[m]anagement, like labor, must have faithful agents" *N.L.R.B. v. Sheraton Puerto Rico Corp.*, 651 F.2d 49, 51 (1st Cir. 1981) (quoting H.R. Rep. No. 245, 80th Cong., 1st Sess. 16-17 (1947)), and the Supreme Court has explained that "supervisors [are] management obliged to be loyal to their employer's interests," *Beasley v. Food Fair of N.C.*, 416 U.S. 653, 659-60 (1973). Thus, "[i]t is fundamental to the structure of the

Act that 'not all forms of employee protest over supervisory changes are per se protected.'" *Yesterday's Children*, 115 F.3d at 45 (quoting *Puerto Rico Food Prods. Corp. v. N.L.R.B.*, 619 F.2d 153, 155 (1st Cir. 1980)).

Such a conclusion follows because "[t]he guiding policy behind § 7 is not implicated when supervisors, who are management's 'faithful agents,' are the ones concertedly agitating against the employer's actions" nor when "non-supervisory employee concerted activity concerns supervisory staffing matters." *Id.*; *see also N.L.R.B. v. Oakes Mach. Corp.*, 897 F.2d 84, 89 (2d Cir. 1990) ("Employee action seeking to influence the identity of management hierarchy is normally unprotected activity because it lies outside the sphere of legitimate employee interest."). Indeed, it is "generally accepted that the hiring and firing of supervisory personnel is a managerial action unrelated to the terms and conditions of the work of non-supervisory employees." *Bob Evans Farms, Inc. v. N.L.R.B.*, 163 F.3d 1012, 1021 (7th Cir. 1998).

Although we have never considered the issue of employee action in response to a supervisor's discharge, as the above discussion suggests, many of our sister circuits have done so, and their approaches — even when they vary — demonstrate that the Board's approach in this case cannot be squared with § 7. Those appellate courts to have considered the issue have generally concluded that employee protest in response to personnel decisions regarding management is protected under § 7 only when such protest is "in fact . . . a protest over the actual conditions of [the employees'] employment" and the "means of the protest [are] reasonable." *Yesterday's Children*, 115 F.3d at 45; *see also Bob Evans Farms*, 163 F.3d at 1021-22; *Oakes Mach. Corp.*, 897 F.2d at 89; *Puerto Rico Food*, 619 F.2d at 156; *N.L.R.B. v. Okla-Inn*, 488 F.2d 498 (10th Cir. 1973); *N.L.R.B. v. Guernsey Muskingum Elec. Co-Op, Inc.*, 285 F.2d 8 (6th Cir. 1960). For the reasons that follow, we adopt this approach to § 7 in cases involving the unique situation of employee protest in response to management personnel changes.

First, it is only sensible that the Board must "proceed with caution" when "non-supervisory employees engage in activity directly related to the retention of supervisors or to supervisory activities." *Sheraton*

*Puerto Rico*, 651 F.2d at 52. When such activity occurs, "the employee protest over a change in supervisory personnel must in fact be a protest over the actual conditions of their employment." *Puerto Rico Food*, 619 F.2d at 155 (alterations omitted). This rule is viewed as a "narrow but well recognized exception to the general rule" that supervisors gain no protection from the Act. *Bob Evans Farms*, 163 F.3d at 1021.

Such personnel decisions regarding management will affect the terms and conditions of employees only in "exceptional cases." *Bob Evans Farms*, 163 F.3d at 1022. Thus, for example, "instruct[ing] the employees on the manner of performing their jobs" appears to characterize the actions of "any proper supervisor." *Puerto Rico Food*, 619 F.2d at 156. Indeed, "every dispute over managerial employees involves working conditions to some degree." *Sheraton Puerto Rico*, 651 F.2d at 53; *see also Bob Evans Farms*, 163 F.3d at 1022 ("Lending a sympathetic ear and umpiring coworker disputes are part of what supervisors do."). Instead, the "impact of such supervisors on working conditions must be special, or at least distinct from the effect which supervisors usually have on employees." *Sheraton Puerto Rico*, 651 F.2d at 53 (internal quotation marks omitted). Absent such a dichotomy, "the line between managers and workers would erode, inconsistently with the rule that denies supervisors the protection of labor law." *Trompler Inc. v. N.L.R.B.*, 338 F.3d 747, 749 (7th Cir. 2003). For instance, the terms and conditions of an employee's workplace may be at issue when the personnel decision is "linked with an underlying employment related concern" so that the supervisor in question "has either contributed to the underlying complaint . . . or has sought to alleviate the pre-existing grievance." *Puerto Rico Food*, 619 F.2d at 156. And, in making this determination the initial focus should be upon "the employees' subjective state of mind." *Id.*; *see also Bob Evans Farms*, 163 F.3d at 1022 (finding "substantial evidence that [a supervisor's] removal would signal a downturn in the working conditions of her charges and was therefore a legitimate employee concern").

We also believe a reasonableness standard is appropriate in this context. The Board's rejection of a reasonableness test for the means of protest relies upon dicta from *N.L.R.B. v. Washington Aluminum Co.*, 370 U.S. 9 (1962), which held, in finding employees' decision

to leave an unheated factory in the middle of winter was protected under § 7, that activity is protected unless it is "unlawful, violent or in breach of contract . . . [or] characterized as 'indefensible' because they . . . show a disloyalty to the employer." *Id.* at 17. The *Washington Aluminum* Court also posited in dicta that "it has long been settled that the reasonableness of workers' decisions to engage in concerted activity is irrelevant to the determination of whether a labor dispute exists or not." *Id.* at 16.

Although we owe deference to the Board's legal conclusions, we cannot abide by its construction of the Act in the context of employee reaction to supervisory terminations. The Board's approach of protecting all such employee reaction regardless of reasonableness utterly fails to account for the bedrock principle that management's role is to be faithful to the employer, not the employee. In addition, the dicta posited in *Washington Aluminum* simply carries no weight in this context. As the First Circuit has explained, "*Washington Aluminum* did not involve the peculiar issue of changes in supervisory personnel." *Abilities and Goodwill Inc. v. N.L.R.B.*, 612 F.2d 6, 10 (1st Cir. 1979). It is only sensible that in an area where "such changes [in supervisory personnel] have only recently been regarded as matters of legitimate employee concern and even then subject to the legitimate claim of employers to a minimum of interference in this area," some limitation on the means of protest employed by employees would exist. *Id.*; *see also Dobbs Houses, Inc. v. N.L.R.B.*, 325 F.2d 531, 539 (5th Cir. 1963) ("The cause of the employees' grievance must be considered in determining the reasonableness of their course of conduct undertaken in protest."). In one of the more recent cases to examine this tension, the Seventh Circuit, in *Trompler*, suggested that the reasonableness standard might be properly viewed as a part of the inquiry into whether protected concerted activity occurred rather than as a separate factor. *Trompler*, 338 F.3d at 749; *see also Oakes Mach. Corp.*, 897 F.2d at 89 (listing reasonableness as one of four factors in determining whether the termination of supervisors affected terms and conditions of employees). Regardless of the specific approach, however, a reasonableness standard has been adopted by every court to have considered the issue.

In sum, we believe the Board's interpretation of § 7 in the unique context of employee protest regarding supervisory personnel change

is unreasonable and should not be given deference. Instead, we choose to follow the approach of our sister circuits, that employee protest in response to personnel decisions regarding management is protected under § 7 only where such protest is "in fact . . . a protest over the actual conditions of their employment" and the "means of the protest [are] reasonable." *Yesterday's Children*, 115 F.3d at 45. Such an approach also aligns with our own precedent interpreting § 7. Although we have noted that the language of § 7 is "broadly-worded," we have also cautioned that "it is not without limits." *TNT Logistics*, 413 F.3d at 407. Indeed, "[t]he purpose of the act was not to guarantee to employees the right to do as they please." *Joanna Cotton Mills Co. v. N.L.R.B.*, 176 F.2d 749, 752 (4th Cir. 1949)(internal citation omitted). "[I]t is not the motive of the participants that we are concerned with here but the 'purpose' of the activity." *Id.* at 753. To be protected, "the purpose of the concerted activities must be the mutual aid or protection of the employees."[8] *Id.* A contrary ruling, as urged by the Board, would inevitably blur the line between employers and employees and potentially create a CEO-by-committee approach whereby employees could control the hiring and firing of their managers by walking out over every managerial change. The Board's approach fails to recognize that "[m]anagement, like labor, must have faithful agents." *Sheraton Puerto Rico*, 651 F.2d at 51.

B.

With this framework in place, we turn to whether the actions of QSI's employees on the morning of November 15, 2003 were properly found to be protected under § 7.

First, we note that neither the ALJ nor the Board considered whether the walkout was in fact a protest over the actual terms and conditions of employment. Instead, the ALJ simply found that "[e]mployees who walk out in protest of the discharge of a supervisor are engaged in protected concerted activity." (J.A. at 19A.) In reviewing administrative action, it is axiomatic that the basis for such action "be set forth with such clarity as to be understandable" because we

---

[8]As we recently explained, "[d]etermining whether activity is protected or not depends on a proper identification of the activity's purpose." *TNT Logistics of N. Am., Inc. v. N.L.R.B.*, 413 F.3d 402, 407 (4th Cir. 2005).

must "judge the propriety of such action solely by the grounds invoked by the agency." *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947). And "[f]or purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943). We thus "remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam). The rule rests on the "basic proposition that a reviewing court may not decide matters that Congress has assigned to an agency." *W. Va. Highlands Conservancy, Inc. v. Norton*, 343 F.3d 239, 248 (4th Cir. 2003). Thus, the fact that neither the ALJ nor the Board passed upon the question of whether the QSI employees' action implicated the terms and conditions of their employment precludes us from doing so here. It does not, however, require us to remand the case to the Board because the Board did pass upon the reasonableness of the walkout and, because we conclude that the Board's finding that the walkout was reasonable was an unreasonable legal conclusion, we grant the petition for review.

As a starting point, we note that in virtually every case involving an employee walkout in response to a supervisor's termination, the court has found such a choice unreasonable. *See*, *e.g.*, *Puerto Rico Food*, 619 F.2d at 156 (noting "[g]enerally, strikes over changes in even low level supervisory personnel are not protected" (internal quotation marks omitted)); *Abilities & Goodwill*, 612 F.2d at 11 (employee "sick out" unprotected); *Bob Evans Farms*, 163 F.3d at 1022-23) (en masse walkout by wait-staff during busy shift not protected); *Dobbs Houses*, 325 F.2d at 538-39 (walkout by waitresses "at the height of the dinner hour" unreasonable); *Henning & Cheadle, Inc. v. N.L.R.B.*, 522 F.2d 1050, 1055 (7th Cir. 1975) (walkout unreasonable when departmental deadline existed). As the Seventh Circuit noted at the time it decided *Bob Evans Farms*, although case law does not necessarily "condemn[ ] walkouts generically in this context," there "is apparently no reported instance of a work stoppage sufficiently tempered to win court approval." *Id.* at 1023. In contrast, courts have routinely approved of less drastic means of protest. *See*, *e.g.*, *Atlantic-Pacific Constr. Co. v. N.L.R.B.*, 52 F.3d 260, 264 (9th Cir. 1995) (approving of letter written to complain about direct supervisor); *Oakes Mach. Corp.*, 897 F.2d at 89 (protecting employee com-

plaints about company president who dealt directly with them because president "directly affect[ed] working conditions by tying salary increases to company profitability and then prevent[ed] employees from working on profitable company projects"); *Guernsey-Muskingum Elec.*, 285 F.2d at 12-13 (approving of employee oral complaint about foreman); *N.L.R.B. v. Phoenix Mut. Life Ins. Co.*, 167 F.2d 983, 988 (7th Cir. 1948) (supporting employees' entitlement to write a letter complaining about supervisor).

We recognize that, more recently, the Seventh Circuit has, in fact, affirmed a Board decision finding a § 8(a)(1) violation resulted from an employee strike regarding management activity. *See Trompler*, 338 F.3d at 752. A closer look at the Seventh Circuit's resolution of that case, however, serves to buttress our finding that the walkout perpetrated by QSI's employees on November 15 was unprotected. In *Trompler*, an employer fired six employees who walked off a shift because their shift supervisor "failed to prevent sexual harassment of one of the six workers by another [who had not joined the walkout]," "failed to deal competently with a worker's drug problem," and "didn't know how to operate the machines used by the workers." *Trompler*, 338 F.3d at 748. In upholding the Board's ruling, the court noted that although the employee action caused the production to shut down for the remainder of the shift, "Trompler was able to make up the lost production . . . at no higher cost or loss of revenue." *Id.* at 752. *Trompler* underscores the rationale behind the line of cases concluding that walkouts and strikes are unreasonable means of protesting personnel decisions regarding management: that such actions cause financial injury to the employer. And, in the context of deciding whether to retain or hire management personnel, it is unreasonable to permit employees to cause financial harm to the employer in order to make their demands heard. A contrary result, as discussed above, would undermine the employer's prerogative to assign faithful agents to serve in its stead.

In contrast to *Trompler*, the QSI workers' actions were unreasonable in this instance: they walked off during the shift, causing potentially massive harm—not just to QSI but also to Smithfield which, under USDA regulations, cannot operate its production shifts in the Plant until the Plant is certified clean by the USDA. With respect to the Seventh Circuit, if the loss of a shift at Bob Evans, and the corre-

sponding loss of its (admittedly delectable) home-style breakfasts is unreasonable, certainly the loss of production at one of America's largest food producers is unreasonable. The means of protest pursued by QSI's employees in this case affected not only QSI's ability to perform its contract with Smithfield but also risked requiring 2,000 to 3,000 workers to lose one day of work. Accordingly, because QSI's employees on November 15 "strayed into the realm of unprotected activity," *Bob Evans Farms*, 163 F.3d at 1024, we grant Smithfield's petition for review.

### III.

Finally, the Board cross-applies for enforcement of the portion of its order finding that Smithfield violated § 8(a)(1) by retaliating against an employee, Dan English, for his union activities. Specifically, the Board found that Smithfield refused to consider English for a job opening in another department because he was photographed by a local paper supporting union activities. Smithfield has not challenged this finding in its petition for review and it has been our practice, from which we shall not deviate here, to grant enforcement to unchallenged portions of a Board order. *See N.L.R.B. v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir. 1984) (enforcing unchallenged portions of Board order).

### IV.

For the foregoing reasons, Smithfield's petition for review is granted and the Board's cross-application for enforcement is granted in part and denied in part.

*PETITION FOR REVIEW GRANTED;*
*CROSS-APPLICATION FOR ENFORCEMENT*
*GRANTED IN PART AND DENIED IN PART*